Harry M. HONEYCUTT,
Plaintiff-Appellant,

v.

AETNA INSURANCE COMPANY,
Defendant-Appellee.

No. 73–1897.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 24, 1974.

Decided Jan. 10, 1975.

Certiorari Denied June 9, 1975.

See 95 S.Ct. 2416.

Philip J. McGuire, Kent G. Chetlain, Chicago, Ill., for plaintiff-appellant.

Daniel J. Leahy, Chicago, Ill., for defendant-appellee.

Before SWYGERT, Chief Judge and CUMMINGS and RIVES,* Circuit Judges.

RIVES, Circuit Judge.

Honeycutt brought this diversity action against Aetna on a policy insuring Honeycutt against loss or damage to his home by fire. On August 18, 1970, and again on August 23, 1970, while the policy was in effect, Honeycutt's home was damaged by fire. Honeycutt gave Aet-

* Circuit Judge Richard T. Rives of the Fifth Circuit is sitting by designation.

na timely notice and submitted proof of loss alleging damage of $4,283.92 by the fire of August 18 and damage of $65,-835.39 by the fire of August 23.

Aetna refused to make any payment. In its answer to Honeycutt's complaint Aetna alleged "that the Plaintiff failed to use all reasonable means to save and preserve the property at and after the loss." (App. 21) Aetna's answer also alleged that Honeycutt fraudulently misrepresented the amount of the loss in the fire of August 23, 1970.

Pursuant to order of court the case was tried solely on the question of liability. On trial, Aetna based its defense on a contention that Honeycutt set or procured the setting of the fires. Aetna's defense was treated by the parties and denominated by the court as a charge that Honeycutt committed arson.[1]

The jury returned its verdict in favor of Aetna: "We, the Jury, find for the defendant Aetna Insurance Company, and find said company not liable on the insurance policy in question." (App. 6) Pursuant to that verdict, final judgment was entered for Aetna. The court denied Honeycutt's post-trial motions for judgment n. o. v. or, in the alternative, for a new trial. This appeal followed.

The issues presented for review are framed by Honeycutt's contentions that the district court committed reversible error in the following ways: (1) In allowing the introduction of evidence improperly obtained by the authorities, and/or by (2) Aetna's representatives, (3) in its instructions to the jury, and (4) in denying Honeycutt's motion for new trial based on newly discovered evidence.

Decision of these issues, of course, necessitates careful consideration of the evidence.

### The Facts

At the time of each fire, Honeycutt lived alone. His wife had died on October 6, 1969, and his four sons were away from home—three in the Navy and one in college. In the Summer of 1968, Honeycutt first listed for sale with a realtor the house and the nine acres of land on which it was located. After receiving no offer, he listed the property with another realtor and a sale on undisclosed terms was consummated in the Spring of 1971, more than six months after the fires.

In August, 1970, when the fires took place, it appears that Honeycutt's home place was his only substantial asset. The property was encumbered with a first mortgage totaling $17,965.17 to Cook County Savings & Loan Association of which $7,000 had been borrowed on April 7, 1970, and a second mortgage of about $20,000 to the First National Bank & Trust Company of Barrington, Illinois. Honeycutt also had an unsecured debt of $300 to the Lake Shore National Bank. His checking account balance was $142 and he had no personal savings account, although he was trustee of a savings account for his sons. He owned no securities or any other real estate. Income tax returns reveal little income. Honeycutt reported on his tax returns a loss of $3,428.64 in 1968 and a loss of $3,716.62 in 1967, and in 1969 he reported total income of $3,897.53 for himself and his wife. At

---

1. At the outset of the closing argument of plaintiff's counsel, the court instructed the jury as follows:

"This case is being submitted to you on the issue of liability only. By that I mean that we are not concerning ourselves in this trial at this time with any question of damages.

"Mr. Honeycutt claims that his premises were covered by an insurance policy, that there was a fire and that he is entitled to be paid by the insurance company in a yet unascertained amount.

"The insurance company says that while there was in fact a policy, they are not liable on the policy because they believe that Mr. Honeycutt either caused the fire or brought about the fire in some way violative of the terms of the policy.

"That is all we are deciding here, should the insurance company be liable on this policy or had they made out a valid defense of arson, which indicates that they are not liable on the policy; we are not concerning ourselves at all in this trial with the question of damages." (App. 278–279.)

the time of the fire, Honeycutt was working for Weber Plastic Company, selling their products as well as products which were designed by him and manufactured on an individual basis by Weber Plastics.

The first fire took place on Tuesday, August 18, 1970, and started under the kitchen sink. Intense heat from the fire melted the solder holding the water pipe joints together. Water rushed from the pipe and extinguished the fire, but also soaked the carpets in the house. In addition, there was extensive smoke damage to the house. Honeycutt claimed that he had left the house about 7:00 A.M. to make a business trip to Stevens Point, Wisconsin.[2] He reported the fire to the Barrington Hills police about 7:00 P.M.; and they, in turn, reported the fire to the fire department.

Honeycutt did not spend the night of August 18 in his home, but checked into a local motel where he continued to live until some time after the second fire. On August 19, the day on which Honeycutt reported the August 18 fire to Aetna, the Company sent two adjustors to examine the fire damage. Later the same day one of them returned to make another inspection. On both the 19th and 20th, Honeycutt and various commercial concerns worked to clean up the damage. On the weekend of August 22–23, he alone continued the clean-up efforts.

The second fire took place on Sunday, August 23, 1970. Honeycutt had spent the day working at his house. A telephone repairman came to repair the telephone around 1:00 or 2:00 P.M. After the repairman left, Honeycutt hung some laundry on an outside line and removed from the house some wet corrugated boarding. He then mowed his 9-acre yard. Honeycutt testified that, after finishing the mowing, he went to the house, where he discovered the fire. He drove to a neighbor's house to ask the neighbor to call the police and the fire department. The official time of the alarm at the fire department was 7:35 P.M.

The fire department extinguished the fire but not before it caused serious damage. Subsequent investigation revealed that there had been separate fires in the living room, bedroom, the TV room, the kitchen, the dining room, and the furnace room. The local police chief made an inspection of the premises on the evening of the fire. The next day, Monday, August 24, he and Fire Chief Mertens, Lt. Arens of the local fire department and Deputy State Fire Marshal Valley made inspections of the Honeycutt house. On the evening of the same day, Honeycutt met with Police Chief Hummel and Fire Marshal Valley in Hummel's office. There, Honeycutt stated that he wanted to learn the origin of the fire and would cooperate 100 per cent with the investigation.

On Wednesday, August 26, around 10:00 A.M., Police Chief Hummel and Deputy State Fire Marshal Schaefer inspected the Honeycutt house and took samples of the burned materials. They entered the house by removing a sheet of plywood which was barring the door. Honeycutt did not learn of this search until the trial. This is the first of the searches claimed improper by Honeycutt.

On Thursday, August 27, there was another inspection of the house which was made by Lt. Mertens of the local fire department, Deputy State Fire Marshals Schaefer and Valley, a private investigator Sutherland, local Police Chief Hummel, Aetna's consulting engineer Alva Todd, Aetna's counsel Leahy, and a photographer for Aetna, and possibly other persons. At the request of Hummel, Honeycutt let them all enter to inspect the house. Honeycutt makes no claim in regard to the propriety of that

---

2. Honeycutt claimed to have had lunch in Stevens Point, Wisconsin, with Weber Plastic's president, who first disputed Honeycutt's story and then later admitted that he might have had lunch with him on the day in question. A stipulation to the effect that he was in error in testifying that he could not have had lunch with Honeycutt was entered by the parties at trial.

search. There was another search on Friday, August 28 or on Saturday, August 29 (the witness, Deputy State Fire Marshal Schaefer, was unsure of the date), at which time Honeycutt, Leahy, Todd and Aetna Adjuster Putnam were present. Honeycutt raises no claim as to the propriety of that search.

Honeycutt does claim that another search made on August 29 was improper. On that date, while Honeycutt was mowing the yard, Leahy and an Aetna photographer made an inspection of the house. Again the plywood sheet was removed to gain entrance to the house. When Honeycutt returned to the house, Leahy, who was standing in the front entrance, told him that the photographer was inside. When the photographer finished, he came out; and the two men drove away.

There was much stronger evidence that the fires were intentionally set than that Honeycutt was the guilty party. He had no criminal record and was not charged with arson by the authorities. The evidence tending to connect Honeycutt with the setting of the fires is circumstantial. The most damaging evidence against him is the showing of possible motive on his part to set the fires and the absence of evidence of motive on the part of any other person.

We turn now to the issues presented for review.

## I.

### Admission of Evidence Obtained by State or City Authorities.

Honeycutt claims that the district court should have excluded the evidence obtained by the authorities in their August 26 search of Honeycutt's house and that the admission of that evidence was error of a constitutional dimension. We should reach and decide such a claim only if necessary, and we therefore examine first whether we may avoid reaching the asserted claim.

The failure to exclude the evidence obtained by this search cannot be termed harmless. That evidence materially supplemented evidence obtained when Honeycutt was present and went strongly to prove that the fires were intentionally set by some person. We do not believe that admission of the evidence obtained by the search was harmless beyond a reasonable doubt.[3]

■ Nor can we imply consent from Honeycutt's cooperation in showing the house on the day before the August 26 search, or his stated desire to cooperate 100 per cent with the arson investigation. Those facts show no more than that Honeycutt would probably have consented to the search if he had been asked. The district court found that "There is some evidence of consent to enter the home, but it is not too compelling." (App. 252.) We find all of the evidence to be consistent with Honeycutt's testimony that "I asked for their help in determining what caused the fire, and I offered my cooperation 100 per cent. Any time they wanted me to open the house, take them in there, take them through or assist them, I would do so." (App. 271.) We cannot imply consent to a search of which Honeycutt had no notice.

■ No argument can be made that there were exigent circumstances, that the officers were in hot pursuit of a criminal, or that it was necessary immediately to search the premises to avoid the destruction of evidence. A warrantless search of Honeycutt's home to find evidence of commission of arson cannot be justified as an administrative search under Frank v. Maryland, 359 U.S. 360, 365, 367, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959). More certainly such a search cannot be justified under Camara v. Municipal Court, 387 U.S. 523, 534, et seq., 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).[4]

---

3. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Bumper v. North Carolina, 391 U.S. 543, 550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

4. See also, See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967), and Air Pollution Variance Board v. Western Alfalfa Corp., 416 U.S. 861, 864, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974).

The learned district judge seems to have thought that the evidence was admissible under the "equities" or peculiar circumstances of this case. In a thoughtful ruling, he said:

"* * * We have pending a motion to strike testimony and to exclude exhibits, which flowed from the entry of persons into the Honeycutt home without his consent.

"And I have considered this matter since it arose this morning and had the opportunity to look into it somewhat over the noon hour.

"The problem is unusual in the context of this case in several aspects. There is some evidence of consent to enter the home, but it is not too compelling.

"The basic problem is whether the right, under the Fourth Amendment, asserted here is limited to criminal cases, and the use of evidence obtained by the invasion of the home in criminal cases.

"That question is unique, in that there seems to be a dirth [sic] of authority on this subject, I was unable to find much. There isn't much help in the reported decisions.

"In the context of this case, however, I think the equities are such—and the atmosphere of the insurance investigation, the conditions of the policy and the attitude of Mr. Honeycutt—all point to the fact that in this case, at least, I should not strike the testimony and the exhibits.

"So that that motion will be denied." (App. 252–253.)

We assume that "the conditions of the policy" to which the judge's ruling referred included the following provisions:

"* * * The insured, as often as may be reasonably required, shall exhibit to any person designated by this company all the remains of any property herein described, and submit to examination under oath by any person named by this company, and subscribe the same * * *."

■ That provision clearly does not authorize a warrantless search of the insured's home. Nor can we find such a search justified by any of the equities or peculiar circumstances of this case. So to hold would be contrary to the "one governing principle" referred to in *Camara, supra,* 387 U.S. at 528, 529, 87 S.Ct. at 1730:

"Nevertheless, one governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant."

In brief, we can find no way to decide this case without reaching Honeycutt's "claim of a constitutional dimension." This Court must decide whether the Fourth and the Fourteenth Amendments require in civil cases that the exclusionary rule be extended to situations where private parties seek to introduce evidence obtained through unauthorized searches made by state officials.

At the outset we recognize the distinction between constitutional rights and the implementation of those rights. The simple language of the Fourth Amendment itself would probably seem clear enough to a person not familiar with some of the literally thousands of pages of complicated judicial commentary which that language has spawned:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Fortunately for this Court, it is now settled that the exclusionary rule, at least insofar as it relates to searches and

seizures,[5] is not itself a constitutional right, but, perhaps of equal importance, it is the sole judicial technique for implementing the vital Fourth Amendment guaranty against unreasonable searches and seizures. The very recent case of United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), so nearly decides the issue in this case that we quote from it at length. Mr. Justice Powell, speaking for the Court, said:

> "In the instant case, the Court of Appeals held that the exclusionary rule of the Fourth Amendment limits the grand jury's power to compel a witness to answer questions based on evidence obtained from a prior unlawful search and seizure. The exclusionary rule was adopted to effectuate the Fourth Amendment right of all citizens 'to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . .' Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure. Weeks v. United States, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652] (1914); Mapp v. Ohio, 367 U.S. 643 [81 S.Ct. 1684, 6 L.Ed.2d 1081] (1961). This prohibition applies as well to the fruits of the illegally seized evidence. Wong Sun v. United States, 371 U.S. 471 [83 S.Ct. 407, 9 L.Ed.2d 441] (1963); Silverthorne Lumber Co. v. United States, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319] (1920).

> "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim:

> " '[T]he ruptured privacy of the victims' homes and effects cannot be

restored. Reparation comes too late.' Linkletter v. Walker, 381 U.S. 618, 637 [85 S.Ct. 1731, 1742, 14 L.Ed.2d 601] (1965).

Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable search and seizures:

> " 'The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' Elkins v. United States, 364 U.S. 206, 217 [80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669] (1960).

Accord, Mapp v. Ohio, *supra,* at 656 (1961); Tehan v. Shott, 382 U.S. 406, 416 [81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081] (1966); Terry v. Ohio, 392 U.S. 1, 29 [88 S.Ct. 1868, 20 L.Ed.2d 889] (1968). In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved.

> "Despite its broad deterrent purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. As with any remedial device, the application of the rule has been restricted to those areas where its remedial objectives are thought most efficaciously served. The balancing process implicit in this approach is expressed in the contours of the standing requirement. Thus, standing to invoke the exclusionary rule has been confined to situations where the Government seeks to use such evidence to incriminate the

---

5. Our discussion of the exclusionary rule is limited to its nexus with the Fourth Amendment and does not extend to its application in cases which involve only the Fifth or Sixth Amendment. Professor Oaks has aptly commented that: "The United States Supreme Court currently enforces an exclusionary rule in state and federal criminal proceedings as to four major types of violations: searches and seizures that violate the fourth amendment, confessions obtained in violation of the fifth and sixth amendments, identification testimony obtained in violation of these amendments, and evidence obtained by methods so shocking that its use would violate the due process clause." Studying the Exclusionary Rule in Search and Seizure, Dallin H. Oaks, 37 Univ. of Chicago L.Rev. 665 (Summer 1970).

victim of the unlawful search. Brown v. United States, 411 U.S. 223 [93 S.Ct. 1565, 36 L.Ed.2d 208] (1973); Alderman v. United States, 394 U.S. 165 [89 S.Ct. 961, 22 L.Ed.2d 176] (1969); Wong Sun v. United States, *supra;* Jones v. United States, 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697] (1960). This standing rule is premised on a recognition that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search." (Footnotes omitted.) 414 U.S. 347–348, 94 S.Ct. 619.

Mr. Justice Brennan dissenting on behalf of himself, Mr. Justice Douglas and Mr. Justice Marshall argued eloquently that uppermost in the minds of the framers of the rule was not its deterrent effect but

" * * * the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." 414 U.S. 357, 94 S.Ct. 624.

The dissenting opinion quotes not only from Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), the decision which fashioned the exclusionary rule, but also from the notable dissent of Mr. Justice Brandeis and Mr. Justice Holmes in Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), from Mr. Chief Justice Warren's opinion for the Court in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (including "The rule also serves another vital function—'the imperative of judicial integrity' "), and from Mr. Justice Holmes' opinion for the Court in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (including "The essence of a provision forbidding the acquisition of evidence in a certain way is

that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all") (see 414 U.S. at 358–362, 94 S.Ct. 613).

The majority opinion responds in its footnote 8, 414 U.S. 352, 94 S.Ct. 613, repeating the quotation from Mr. Justice Holmes' opinion in *Silverthorne, supra.* The majority footnote then distinguishes *Silverthorne* from *Calandra* and concludes: "In these circumstances, *Silverthorne* is certainly not controlling. To the extent that the Court's broad dictum might be construed to suggest a different result in the present case, we note that it has been substantially undermined by later cases. See Parts III and IV of this opinion." 414 U.S. 353, 94 S.Ct. 622.

Thus the majority opinion in *Calandra* bears out Professor Oaks' full discussion of the trend of the Supreme Court's decisions beginning: "When the Supreme Court has had to make decisions on the scope of the exclusionary rule, its opinion has usually stressed and its reasoning seems to have been dictated by the factual considerations of deterrence rather than the normative arguments of judicial integrity." 37 Univ. of Chicago L.Rev. 669, 670.

The majority opinion in *Calandra* seems to bear out the sober views of Mr. Chief Justice Taft in *Olmstead, supra,* 277 U.S. 438, 468, 48 S.Ct. 564, 569, 72 L.Ed. 944:

"A standard which would forbid the reception of evidence, if obtained by other than nice ethical conduct by government officials, would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it."

The majority opinion in *Calandra* is also supported by Mr. Justice Black's constitutional philosophy as expressed in

his concurring opinion in Plymouth Sedan v. Pennsylvania, 380 U.S. 693, 703, 85 S.Ct. 1246, 1252, 14 L.Ed.2d 170 (1965):

> "For these reasons, I cannot agree that because we ourselves might believe the practice of obtaining evidence in that manner 'shocks the conscience' or is 'shabby' or 'arbitrary,' we are commanded or even authorized by the Constitution to prevent its use as evidence. That seems to me to be amending the Constitution, which is the business of the people, not interpreting it, which is the business of the courts."

■ We have discussed *Calandra* at such length because, in the absence of an authoritative precedent expressly deciding whether or not the exclusionary rule applies to civil actions, *Calandra* seems to us clearly to point the way. Holding that the exclusionary rule is inapplicable to grand jury proceedings where, of course, government is a party seems to establish a fortiori its inapplicability to civil actions between private parties, and especially so when, after the most thorough consideration, every reason asserted for the applicability of the rule to civil actions is held to be insufficient.

In *Plymouth Sedan, supra,* the Pennsylvania Supreme Court had held that the exclusionary rule applies only to criminal prosecutions and not to forfeitures, which it held to be civil in nature. The Supreme Court reversed the judgment of the State Court, but on the reasoning that, though the form of the proceeding was civil, the forfeiture was clearly a penalty for a criminal offense.

Writing for the Court, Mr. Justice Goldberg quoted from and relied on the opinion in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886): "As this Court has acknowledged, '[t]he leading case on the subject of search and seizure is Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746].' Carroll v. United States, 267 U.S. 132, 147 [45 S.Ct. 280, 69 L.Ed. 543]. See Mapp v. Ohio, *supra* [367 U.S. 643] at 646–647 [81 S.Ct. 1684, 6 L.Ed.2d 1081]." 380 U.S. 696, 85 S.Ct. 1248. The rationale of *Boyd* itself seems to foreclose the applicability of the exclusionary rule to civil actions between private parties.

Other Supreme Court cases have tended strongly to indicate that the exclusionary rule does not apply to ordinary civil actions.[6] Decisions of federal courts of appeals have tended in the same direction.[7]

■ We hold that the Fourth and Fourteenth Amendments do *not* require in civil cases that the exclusionary rule be extended to situations where private parties seek to introduce evidence obtained through unauthorized searches made by state officials.

## II.

### *Admission of Evidence Obtained by Aetna's Representatives.*

■ It has long been settled that the Fourth Amendment protection against unlawful searches and seizures applies only to governmental action.[8] We have found no other rule, constitutional, statutory or judicial, which would

6. See, *e. g.,* Alderman v. United States, 394 U.S. 165, 174, 175, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966); Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503 (1954).

7. See *e. g.,* N. L. R. B. v. South Dade Daily Press, 415 F.2d 360, 364 (9 Cir. 1969); United States v. Schipani, 435 F.2d 26, 28 (2 Cir. 1970); United States v. McSurely, 154 U.S. App.D.C. 141, 473 F.2d 1178, 1197–1201 (1972). For other cases, both federal and state, we refer to a comprehensive annotation on "Admissibility in Civil Case of Evidence Obtained by Unlawful Search and Seizure," 5 A.L.R.3d 670, et seq.

8. Burdeau v. McDowell, 256 U.S. 465, 475, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *accord,* United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), Mr. Justice Brennan dissenting at 356, 94 S.Ct. at 624: "The commands of the Fourth Amendment are, of course, directed solely to public officials." See also, Sackler v. Sackler, 15 N.Y.2d 40, 255 N.Y.S.2d 83, 203 N.E.2d 481, 5 A.L.R.3d 664.

compel the rejection of logically relevant evidence obtained by a private person through an unauthorized search and seizure. We hold that the district court did not abuse its discretion in refusing to discipline or punish Daniel Leahy and his client, Aetna. A number of considerations may well have led Leahy to the honest but incorrect belief that his intrusion was authorized—e. g., Honeycutt's duty under the policy of insurance, his professed wish to cooperate fully with the investigation, and his attitude and conduct throughout the investigation of the fires. Indeed, following discovery of the intrusion, Honeycutt registered no indignation or objection. When Honeycutt discovered that Leahy and the photographer had entered his house without his permission, Leahy was outside and the photographer was still inside taking pictures. Honeycutt did not ask that the photographer come out but left him to his own volition. Clearly, there was no abuse of discretion on the part of the district court in admitting the evidence obtained by Aetna's representatives.

### III.

*Court's Instructions to Jury.*

Honeycutt complains that the court erred in refusing to give any of three proposed jury instructions (Charges 141, 142 and 143) on presumption of innocence.[9]

Charges 141 and 143 are defective because they place on a defend-

ant, who is trying to establish the arson defense, a burden of proof that is heavier than the predominant weight of the evidence test established in Illinois by Sundquist v. Hartford Mutual Fire Ins. Co., 371 Ill. 360, 21 N.E.2d 297 (1939). The judge did not err in failing to give the requested Charge 142. That instruction was probably suggested by Appleman on Insurance § 13881, citing First National Bank v. Commercial Union Assur. Co., 33 Or. 43, 52 P. 1050 (1898). In that case the Oregon Supreme Court held that it was not error to give the charge. The Oregon Supreme Court in subsequent cases also held that it was not error to give a similar charge.[10] So far as our research reveals, no Oregon court has been presented with the issue of whether such a requested charge must be given, and no Illinois court has ruled on the propriety of such a charge or any similar charge.[11]

The three cited Oregon decisions are unusual in holding that rebuttable presumptions may be weighed against contrary evidence. Most jurisdictions have adopted the view developed in Thayer, Preliminary Observations on Evidence, Boston (1898) Ch. VIII and Ch. IX, and Wigmore on Evidence 3d ed. § 2491, that presumptions take the place of facts and, as a result, disappear when contrary evidence is presented. However, this area of the law is so confused that presumptions are sometimes treated as evidence, even in states that have adopted

---

**9.** Charge 141:
"The defense of arson is affirmative in character upon which the insurer has the burden of proof. Any inference must be strong and almost inevitable. The presumption of innocence continues until the contrary is established."
  Charge 143:
"The presumption very properly is that all men are honest. Where arson is charged, it must affirmatively be proven by clear and convincing testimony. It cannot be established upon mere suspicion."
  Charge 142:
"There is a natural presumption of innocence where the act of arson is charged, and you have a right to consider the improbability

that one will commit an act of criminal nature." (App. 41.)

**10.** Wychoff v. Mutual of New York, 173 Or. 592, 147 P.2d 227 (1944); Ward v. Queen City Fire Ins. Co., 69 Or. 347, 138 P. 1067 (1914).

**11.** If a requested instruction directs attention to a point upon which the court should instruct the jury, technical defects in the request will not excuse the court's failure to properly instruct the jury on that point. Celanese Corporation of America v. Vandalia Warehouse Corporation, 424 F.2d 1176, 1181 (7 Cir. 1970); Wright & Miller, Federal Practice & Procedure, Civil § 2552, notes 25 and 26.

the Thayer-Wigmore rule. Illinois is typical.[12]

The district court gave to the jury a number of other instructions requested by the plaintiff-appellant.[13]

■ In our opinion, those instructions properly and adequately charged the jury on the point to which Honeycutt's requested instructions directed attention. In any event, when the evidence and the given instructions are considered, it is clear, under Rule 61, Fed.R.Civ.P., and 28 U.S.C. § 2111, that the refusal to give any of the three requested instructions or any further instruction on the point does not warrant reversal of the judgment.

## IV.

### Newly Discovered Evidence.

■ Finally, Honeycutt asserts that the newly discovered restaurant check

compels reversal or a new trial since it proves that Honeycutt could not have set the first fire. There are several answers to this contention. The check does not prove that he could not have set the first fire, since it is so unclear from the record when the first fire was set that it is possible that Honeycutt could have set the fire before leaving for Stevens Point, Wisconsin. The evidence is merely cumulative. Honeycutt testified that he ate lunch in Stevens Point and spent the day there. The only evidence that he was not at Stevens Point was the testimony of Mr. Watruba, President of Weber Plastics. The stipulation entered into by counsel that Mr. Watruba had been mistaken in his testimony that he could not have had lunch with Honeycutt on the day in question practically destroyed the effect of Watruba's contrary testimony. The newly discovered evidence, in all probability, would not have resulted in a different verdict. In short,

12. See Flynn v. Vancil, 41 Ill.2d 236, 242 N.E.2d 237 (1968); Miller v. Pettengill, 392 Ill. 117, 63 N.E.2d 735 (1945); Nelson v. Stutz Chicago Factory Branch, 341 Ill. 387, 173 N.E. 394 (1930); Lohr v. Barkman Cartage Co., 335 Ill. 335, 167 N.E. 35 (1929); Osborne v. Osborne, 325 Ill. 229, 156 N.E. 306 (1927); Johnson v. Johnson, 187 Ill. 86, 58 N.E. 237 (1900); Graves v. Colwell, 90 Ill. 612 (1878); Lamkin v. Frizol, 7 Ill.App.3d 129, 287 N.E.2d 182 (1972); Botich v. Lorillard Company, 127 Ill.App.2d 232, 262 N.E.2d 38 (1970); McElroy v. Force, 75 Ill.App.2d 441, 220 N.E.2d 761 (1966); Hendrick v. Uptown Safe Deposit Co., 21 Ill.App.2d 515, 159 N.E.2d 58 (1959); Sheldon v. Brandstetter, 325 Ill.App. 595, 60 N.E.2d 576 (1945). The most complete discussion of the problem of the evidentiary weight of rebuttable presumptions is contained in an annotation at 5 A.L.R.3d 19–85. See also, McCormick on Evidence 2d ed., Ch. 36 §§ 342, et seq.

13. Including the following:

"In considering the evidence in this case you are not required to set aside your own observation and experience in the affairs of life, but you have a right to consider all the evidence in the light of your own observation and experience.

\*　\*　\*　\*　\*　\*

"I instruct you that the defendant is required to prove its case, its contention of arson by the greater weight or preponderance of the evidence. And if you believe from the evidence that it has not so proven its case or

the evidence is evenly balanced so that you are unable to say on which side the greater weight of the evidence is, or if the greater weight of the evidence is in favor of the plaintiff, Mr. Honeycutt, then the verdict of the jury should be for the plaintiff.

"When I say that a party has the burden of proof on any proposition or that a party must prove his contention by a preponderance of the evidence, or when I use the expression 'if you find' or 'if you decide,' I mean that you must be persuaded considering all the evidence in the case that the proposition on which either party has the burden of proof is more probably true than not true.

\*　\*　\*　\*　\*　\*

"You are being told, and have been told, that the proof is upon the defendant insurance company to establish its contention of arson by the preponderance or greater weight of the evidence, that said fire was set with Harry Honeycutt's prior knowledge or consent or that he procured the setting thereof. This alleged purposeful setting of the fire and burning must be proven either by direct evidence or by circumstantial evidence. The proof need not be by the direct evidence of persons who saw the occurrence sought to be proved.

"The evidence offered and relied upon by the defendant to establish the claim that Harry Honeycutt procured the setting of the fire or that it was set with his prior knowledge or consent is of a kind and character known in the law, and called in the law, circumstantial evidence." (App. 303, 304, 305.)

the district court did not abuse its discretion when it denied Honeycutt's motion for new trial.

The judgment is affirmed.