UNITED STATES of America,
Plaintiff-Appellee,

v..

Robert CONROY, Raymond Dahl, Frederick Jacobs and Walter K. Schubert,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Leonard A. WALKER, a/k/a "Silver",
Defendant-Appellant.

Nos. 77–5436, 77–5444.

United States Court of Appeals,
Fifth Circuit.

Feb. 23, 1979.

Rehearing and Rehearing En Banc
Denied April 12, 1979.

Alvin B. Rubin, Circuit Judge, dissented in part and filed opinion.

Melvyn Kessler, Miami, Fla., for defendants-appellants in 77–5436.

J. V. Eskenazi, Michael P. Sullivan, Barbara D. Schwartz, Asst. U. S. Attys., Miami, Fla., for U. S. in both cases.

Theodore J. Sakowitz, Federal Public Defender, David K. Kelley, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant in 77–5444.

Before RONEY, RUBIN and VANCE, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

If the Coast Guard cutter DAUNTLESS is not otherwise recorded in history, her forays to protect coasts of the United States from illicit imports will be commemorated in decisions of the Fifth Circuit.[1] The defendants, convicted of either conspiracy or both conspiracy and attempting to import marijuana,[2] charge that the zeal of her commanding officer exceeded his statutory authority and led him to violate their constitutional rights by boarding their American vessel in Haitian waters. Having recently attempted to chart the rules concerning coast guard authority with respect to domestic vessels in coastal waters[3] as well as on the high seas,[4] we now explore the same questions in the uncharted foreign domain.

## I.

Once upon a time there was an informer, most of these tales begin. In this instance he was Flemming Larson Budal, a Danish citizen who was residing in the United States, had been an informer for several months, had worked on a number of other cases, and had been paid $200 a week by the Drug Enforcement Administration.

In December, 1975, Budal began a series of conversations with two of the defendants, Schubert and Conroy, in New England, and together they formulated a plan to smuggle a boatload of marijuana from Jamaica. During this time Budal was in constant communication with a special agent of the DEA.

Schubert obtained a 53–foot Gulfstar sailboat in Ft. Lauderdale. Soon afterwards Budal flew to Ft. Lauderdale where he was met by Dahl and Schubert, and another indictee who was separately tried. They were later joined by a fourth defendant, Jacobs, and together lived on the vessel, the NAHOA, until September 3, 1976, when they weighed anchor for Jamaica. Conroy remained in New England, allegedly to await the return of the other defendants with their cargo.

---

1. *See United States v. Cadena,* 5 Cir. 1978, 585 F.2d 1252; *United States v. Rodriguez,* 5 Cir. 1978, 585 F.2d 1234; *United States v. One (1) 43 Foot Sailing Vessel "Winds Will",* 5 Cir. 1976, 538 F.2d 694; *United States v. Winter,* 5 Cir. 1975, 509 F.2d 975, *cert. denied,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41.

2. Schubert was sentenced to five years imprisonment on each count, running concurrently, and an equal special parole term on the conspiracy count, and was fined $30,000. Conroy, who was convicted only on the conspiracy count, was sentenced to four and one-half years imprisonment and an equal special parole term, and was fined $5,000. Dahl was sentenced to two and one-half years imprisonment and a special parole term of three years on each count, running concurrently. Jacobs was sentenced pursuant to the Federal Youth Corrections Act. Walker, who was also convicted only on the conspiracy count, was sentenced to three and one-half years and a four year special parole term, and was fined $5,000.

3. *See, e. g., United States v. Freeman,* 5 Cir. 1978, 579 F.2d 942; *United States v. Caraballo,* 5 Cir. 1978, 571 F.2d 975.

4. *See, e. g., United States v. Warren,* 5 Cir. en banc 1978, 578 F.2d 1058; *United States v. One (1) 43 Foot Sailing Vessel "Winds Will",* 5 Cir. 1976, 538 F.2d 694; *United States v. Hillstrom,* 5 Cir. 1976, 533 F.2d 209 *cert. denied,* 1977, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749; *United States v. Odom,* 5 Cir. 1976, 526 F.2d 339.

The DEA agent had furnished Budal two electronic detection devices of the kind known as beepers, one of which was to be turned on when the vessel was loaded. This device emits a signal by means of which its location can be determined by other electronic equipment. Rather then keep either on his person, Budal concealed one in the engine room and the other in an air vent on the NAHOA.

When the NAHOA was about 40 miles from Jamaica, the crew met the fifth defendant, Walker, who came out from the island on a small motorboat. Walker made four trips to the NAHOA ferrying marijuana.

The DAUNTLESS, under the command of Lieutenant Robert Council, was on border patrol in the Windward Passage between Haiti and Cuba, on guard for the NAHOA. When a DEA plane flying over nearby waters received an electronic signal from one of Budal's beepers, the DAUNTLESS attempted to establish a barrier patrol in the Windward Passage.

A day later the commanding officer of the DAUNTLESS recognized a radar beep on his scope as a vessel located about nine miles southwest of Haiti. He set his course for the vessel, and soon sighted her; it was, as anticipated, the NAHOA. He attempted to communicate with the vessel by radio, flag, and flashing lights, all signaling her to heave to. Nevertheless, those aboard the vessel set course straight for Haiti, and entered that nation's territorial waters.

Oral approval, later confirmed in writing, to enter Haitian waters and search the NAHOA was obtained from the Haitian Chief-of-Staff, and the DAUNTLESS continued in pursuit. When on further signals, the NAHOA did not halt, the flag Sierra Quebec III was raised: this signifies "stop or we'll shoot." The NAHOA then hove to, and Lieutenant Council pulled alongside her in a small boat. He smelled marijuana, and asked permission to board. Schubert denied his request, but Lieutenant Council went on the vessel and requested the ship's papers. Schubert prevented him from entering the ship's cabin; the lieutenant ordered a search, and found 7000 pounds of marijuana.

Defendants Conroy, Schubert, Dahl and Jacobs contend that in this dramatic encounter the Coast Guard were little better, legally, than pirates. The installation of the beeper was an illegal search; the boarding of the vessel in Haitian waters exceeded the statutory authority of the Coast Guard and violated their constitutional rights because it was unreasonable and warrantless. In addition, defendant Walker, who was separately tried, alleges that there was insufficient evidence to convict him of conspiracy, and that procedural errors denied him a fair trial.

## II. INSTALLATION OF THE BEEPER

A panel of this court has held that the installation of a beeper on an automobile is a search within the meaning of the Fourth Amendment because it defeats the expectation of privacy of the automobile's occupant; it is, therefore, prohibited unless a warrant is obtained or there is sufficient basis for the failure to obtain a warrant to render the act reasonable. *United States v. Holmes,* 5 Cir. 1975, 521 F.2d 859. En banc, the court again affirmed the district court on the issue, but only by an evenly divided vote, 5 Cir. 1976, 537 F.2d 227. For present purposes, we assume that the *Holmes* panel establishes the law of the circuit.[5] *Compare United States v. Abel,* 5 Cir. 1977, 548 F.2d 591, *cert. denied,* 431 U.S. 956, 97 S.Ct. 2678, 53 L.Ed.2d 273; *United States v. Emery,* 1 Cir. 1977, 541 F.2d 887; *United States v. Hufford,* 9 Cir. 1976, 539 F.2d 32, *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614; *United States v. Frazier,* 8

5. As has been pointed out, *see* Note, *Tracking Katz: Beepers, Privacy, and the Fourth Amendment,* 86 Yale L.J. 1461 (1977), *Holmes* represents a relatively restricted view of permissible police conduct with respect to beepers; this approach may be warranted because information yielded by beepers would not normally be accessible to the reasonably curious person. Certainly *Holmes* cannot be restricted to automobiles, because there is at least as great an expectation of privacy in vessels.

Cir. 1976, 538 F.2d 1322, *cert. denied,* 1977, 429 U.S. 1046, 97 S.Ct. 751, 50 L.Ed.2d 759.

Nonetheless we note that here, unlike *Holmes,* there was no trespass [6] when the beeper was installed for Budal had the right to be on board the vessel; moreover, there was probable cause to believe that the NAHOA would be used to transport contraband.[7] However, validity of the installation of the electronic device does not rest only on these distinctions; the transmission of the signals was not, under the circumstances, an invasion of the privacy of others, for Budal was under no legal obligation to conceal his whereabouts. Thus the case is controlled by the decision in *United States v. White,* 1971, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453, in which a plurality of the court held that there is no privacy invasion when a confidential informant wears a recording device and surreptitiously transmits his own conversations with unknowing lawbreakers. That decision was based on the premise that a participant in a conversation has no legal right to protect his erroneous belief that those in whom he confides will safeguard the secrets he divulges. *See also Lopez v. United States,* 1963, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462. If the informant may reveal the conversation at a later time, he may contemporaneously transmit it to third persons. Accordingly, in *Abel, supra,* we upheld, on the basis of the owner's consent, the warrantless installation of an electronic device on an airplane.

Here, Budal was not the vessel owner, but he had a right to go aboard, and his placement of the devices on the vessel rather than on his person does not render its introduction invalid.[8] *See also United States v. Cheshire,* 5 Cir. 1978, 569 F.2d 887, *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (consent by owner to installation on a plane he had rented to the defendant).

Appellants suggest that the beepers may have been installed without prior written authorization as required by the Internal Regulations of the DEA. Although the issue was fleetingly discussed during the trial court's hearing on the motion to suppress, there is no evidence in the record of noncompliance with the regulations. The regulations upon which the claim is based are not cited; in the absence of evidence establishing the existence of such a requirement and its breach, we do not reach the issue whether noncompliance, if shown, would require suppression of evidence obtained as a result of the improper installation. *See United States v. Caceres,* 9 Cir. 1976, 545 F.2d 1182, 1187, *cert. granted,* 1978, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784; *United States v. Leahey,* 1 Cir. 1970, 434 F.2d 7, 11.

### III. THE SEIZURE IN FOREIGN WATERS

The Fourth Amendment not only protects all within our bounds; it also shelters our citizens wherever they may be in the world from unreasonable searches by our own government. *Reid v. Covert,* 1957, 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148, 1157. *See* Note, *The Applicability of the Exclusionary Rule in Federal Court to Evidence Seized and Confessions*

---

**6.** *See Holmes, supra,* 521 F.2d at 865 ("In addition, of course, the 'beeper' installation was accomplished by an actual trespass.")

**7.** In *Holmes, supra,* 521 F.2d at 866, the court rejected the probable cause basis, saying:
The district judge determined otherwise because the agents, at the time of the installation had no information that the van had ever been used to transport contraband and no information that it would be so used in the instant transaction. . . . He considered their actions as based only upon an unfounded suspicion, not confirmed until Holmes called agent Cox one and a half days later, on August 5, to say that the van would be used because of the large quantity of marijuana to be delivered.

**8.** In this connection, we note that the beepers did not transmit private conversations. We have no occasion to consider whether a distinction might be drawn had a recording or transmitting device been placed that would intercept conversations in which Budal did not participate. *Cf. Irvine v. California,* 1954, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561, decided prior to the application of the exclusionary rule to the states in *Mapp v. Ohio,* 1961, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

*Obtained in Foreign Countries,* 16 Colum. J. Transnat'l L. 495 (1977). The mere consent of foreign authorities to a seizure that would be unconstitutional in the United States does not dissipate its illegality even though the search would be valid under local law.[9] Indeed the United States does not here contend that those aboard the NAHOA were beyond the shield of the Fourth Amendment. The issue is whether the search was invalid because it was made without a warrant and by a federal agency, the Coast Guard, that lacked express statutory authority to conduct it.

### A. Statutory Authority

■ In *United States v. Warren,* 5 Cir. en banc 1978, 578 F.2d 1058, we held that the Coast Guard has authority under 14 U.S.C. § 89(a)[10] to board American vessels on the high seas beyond the twelve-mile limit not only to inspect for safety and documentation but also to "look for obvious customs and narcotics violations." 578 F.2d at 1065. In *United States v. Cadena,* 5 Cir. 1978, 585 F.2d 1252, we gave the same statutory provision, Section 89(a), a reading

broad enough to cover the stop on the high seas of foreign vessels subject to extra-territorial application of domestic law. That statute in terms, however, would not reach the territorial waters of another nation for it relates only to "the high seas and waters over which the United States has jurisdiction." [11]

Conceding that the statute per se would not authorize the Haitian search, the government urges that the phrase, "upon the high seas and waters over which the United States has jurisdiction," was not intended to be restrictive, and that the Coast Guard has implicit power to search an American vessel in foreign waters even in the absence of express statutory authority. We agree.

The legislative history of the present form of the statute leads to the conclusion that the high-seas phrase was not intended to be restrictive. Before it was amended to incorporate that phrase, the statutory authority of the Coast Guard was examined in *Maul v. United States,* 1927, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171. The majority opinion searched specific statutes to find

---

9. Cases admitting evidence seized by foreign authorities on the basis of insufficient American law enforcement involvement to warrant exclusion include: *United States v. Morrow,* 5 Cir. 1976, 537 F.2d 120, *cert. denied,* 1977, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806; *Stonehill v. United States,* 9 Cir. 1968, 405 F.2d 738, *cert. denied,* 1969, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747; *Brulay v. United States,* 9 Cir. 1967, 383 F.2d 345, *cert. denied,* 389 U.S. 986, 88 S.Ct. 469, 19 L.Ed.2d 478; *Birdsell v. United States,* 5 Cir. 1965, 346 F.2d 775, *cert. denied,* 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366. *Compare United States v. Mundt,* 10 Cir. 1974, 508 F.2d 904, *cert. denied,* 1975, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103. The case applying the most restrictive role to federal use of evidence obtained by foreign authorities is *United States v. Jordan,* 1975, 23 C.M.A. 525, 50 C.M.R. 664, on reh. 1976, C.M.A., 19 Crim.L. Rep. 2025, a Court of Military Appeals decision.

10. 14 U.S.C. § 89(a) provides in part:
The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States. For such purposes, commissioned, warrant, and petty officers may at any time go on board of any vessel subject to the jurisdiction, or to the operation of any law, of the United States, address inquiries to those on board, examine the ship's documents and papers, and examine, inspect, and search the vessel and use all necessary force to compel compliance. When from such inquiries, examination, inspection, or search it appears that a breach of the laws of the United States rendering a person liable to arrest is being, or has been committed, by any person, such person shall be arrested . . .; or, if it shall appear that a breach of the laws of the United States has been committed so as to render such vessel, or the merchandise, or any part thereof, on board of, or brought into the United States by, such vessel, liable to forfeiture . . . such vessel or such merchandise, or both, shall be seized.

11. Cf. *United States v. Pringle,* 5 Cir. 1978, 576 F.2d 1114, upholding a warrantless border search of mail by customs officials pursuant to statutory authority in 19 U.S.C. § 1582, and *United States v. Freeman,* 5 Cir. 1978, 579 F.2d 942, similarly approving customs officers warrantless search of a vessel in customs waters (within four leagues of shore) pursuant to authority in 19 U.S.C. § 1581(a).

express statutory authorization for the Coast Guard to seize domestic vessels on the high seas in enforcing the revenue laws. Mr. Justice Brandeis, with whom Mr. Justice Holmes joined, concurring, would not have rested on an interpretation of specific statutory authority because of his apprehension that "the construction adopted by the court may have in other cases far-reaching and regrettable results." 274 U.S. as 512, 47 S.Ct. at 739, 71 L.Ed. at 1176. He added that, notwithstanding what he perceived as lack of express statutory language, "authority [to seize American vessels beyond the territorial waters] exists because it is to be implied as an incident of the police duties of ocean patrol which Congress has imposed upon the Coast Guard." *Id.*

Thereafter, Congress amended Section 89(a) to incorporate the high-seas phrase in the hope of avoiding the problem foreseen by Mr. Justice Brandeis. The act was designed to overturn the *Maul* majority's strict interpretation of the laws governing the conduct of the Coast Guard, and the House Committee report quoted Mr. Justice Brandeis at length. H.R. Rep. No. 2452, 74th Cong., 2d Sess. 3–4 (1936). It cited with approval his view that "the Coast Guard is authorized to arrest American vessels subject to forfeiture under our law, no matter what the place of seizure and no matter what the law violated." *Id.* at 3. In supporting the new legislation governing the Coast Guard, the Committee observed, "In the future it is possible that, based upon some expressions in the majority opinion [in *Maul*], the contention will be made that express authority of law is necessary to secure enforcement by the Coast Guard of some laws and also to give jurisdiction to enforce those laws beyond the 12–mile limit." *Id.* at 2–3. The proposed legislation was intended "to prevent those possible 'far-reaching and regrettable results.'" *Id.* at 3.

The language adopted by Congress in enacting what is now Section 89(a) was adequate to deal with the precise situation presented in *Maul,* a search of an American vessel on the high seas. However, while affirmatively empowering the Coast Guard to engage in law enforcement activities on the high seas and in American territorial waters, the resultant statute was silent as to the role of the Coast Guard elsewhere. The reason for the omission is apparent: the authority of the Coast Guard to proceed in foreign territorial waters simply was not a matter entertained by Congress while deliberating upon the statute.

Here, once again, as Chief Judge Brown has observed, we are asked "to determine what Congress would have thought about a subject about which it never thought . . . and one about which we have never thought nor any other Court has thought." *Wirth Ltd. v. S/S Acadia Forest,* 5 Cir. 1976, 537 F.2d 1272, 1276. Congress's silence on a subject about which no one had suggested a need to speak should not be interpreted as reflecting an intent either to grant or to deprive the Coast Guard of authority to proceed in foreign territorial waters to enforce American law.

■ Because neither mandate nor prohibition of search can be divined from Section 89(a), the Coast Guard's authority, if it exists, must be, as Mr. Justice Brandeis said, an incident of its other powers. The powers that Congress gives agencies in the executive branch are better when—as is usually the case—they are explicit. The statute that is express and unequivocal is least likely to be misunderstood or violated either by neglect or zealous overuse. Yet authority may be granted by inference as well; in its relationship with the executive branch, Congress is not bound by the strictures that apply to the criminal law, and require such statutes to be explicit.[12] The pattern of legislation from 1790 to 1927 traced by Mr. Justice Brandeis and the subsequent congressional action we have here discussed,

---

12. *See, e. g., Bell v. United States,* 1955, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905; *United States v. Bridges,* 5 Cir. 1974, 493 F.2d 918,

922; *Simpson v. Simpson,* 5 Cir. 1974, 490 F.2d 803, 809, *cert. denied,* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141.

make it clear that, in the absence of objection by the sovereign power involved, Congress intended the Coast Guard to have authority to stop and search American vessels on foreign waters as well as on the high seas and in territorial waters even though it never said so with unequivocal didacticism.

### B. International Law

■ Our statutory interpretation of Coast Guard authority, premised on the concurring opinion of Mr. Justice Brandeis in *Maul*, is implicitly supported by principles of international law that justify law enforcement activities by the Coast Guard in foreign waters. International law is part of our domestic law. *The Paquete Habana,* 1900, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320, 328. The possible application of the law of nations to supplement the statute is consistent with the statement in the House of Representatives report, "The powers conferred by this act are not to be construed to affect any other powers conferred by existing law." H.R.Rep. No. 2452, at 4.

■ The law of nations classifies Coast Guard vessels as warships. Such vessels belong to the State, are under the direction of a military commander and manned by a military crew, and legally bear the ensign of the national navy. *See* II C. Hyde, International Law 395 (1922): Convention on the High Seas, 450 U.N.T.S. 82, 13 U.S.T. 2312, T.I.A.S. No. 5200, art. 8.

Early interpretations of the law of nations denied the right of innocent passage to warships; it was thought that armed vessels did not "enjoy an absolute legal right to pass through a state's territorial waters any more than an army may cross the land territory," P. Jessup, The Law of Territorial Waters and Maritime Jurisdic-

tion 120 (1927), and prior permission had to be obtained. Until 1959, a regulation issued by the United States Office of the Chief of Naval Operations provided, "Naval vessels should not be navigated in or near such claimed territorial waters without having obtained prior authorization from higher authority." 4 Whiteman, Digest of International Law 417 (1965).[13]

The United-Nations-sponsored Convention on the Territorial Sea and the Contiguous Zone entered into force in 1964; the United States Senate had previously ratified the Convention in 1960, and the President had signed it in 1961. 15 U.S.T. 1606, T.I.A.S. No. 5639 (1958). Haiti is also a party to the Convention. Thus the Convention represents existing U. S. policy, at least with respect to other party nations.

After much debate, the draftsmen of the multilateral treaty rejected any requirement of previous authorization by a coastal state for the entry of a foreign warship into its territorial waters. *See* 4 Whiteman, *supra,* at 415–16. Article 14(1) of the Convention on the Territorial Sea and the Contiguous Zone states simply, "Subject to the provisions of these articles, ships of all States, whether coastal or not, shall enjoy the right of innocent passage through the territorial sea." 15 U.S.T. at 1610. Article 16(1) provides that the coastal state may take "the necessary steps in its territorial sea to prevent passage which is not innocent." No distinction is made between warships and other vessels.

■ At least between parties to the Convention, such as the United States and Haiti, a warship of one nation may enter the territorial waters of the other without first giving notification and receiving authorization.[14] Ratification of the conven-

---

13. Indeed, on one occasion in 1957, the commanding officer of an American naval vessel was reprimanded for entering Mexican territorial waters without prior permission from the Mexican government. The purpose of the entry was to investigate a fishing vessel in Mexican waters believed to be of American registry. The reprimand followed a protest of the entry

by the Mexican government. 4 Whiteman, *supra,* at 6–7.

14. Some nations, all from the communist bloc, adopted the Convention with a reservation declaring that they believed that a coastal state had the right to establish procedures for the authorization of passage of foreign warships through territorial waters. 4 Whiteman, *supra,* at 416. Haiti is a party to the Convention

tion by the United States manifests implicit authorization for its warships to do what the warships of other nations might do. The DAUNTLESS was not, of course, on a hostile mission. Indeed, it bears emphasis again that, despite the fact that presumably no consent by Haitian authority was required under the terms of the treaty, permission was in fact obtained. Therefore, in the ensuing search, there was a conjunction of implicit recognition by the United States Government of the power of its warship to make the search, and explicit approval of the search by the Haitian government.

 Even had we been provided no guidance by the implicit authorization granted warships under the treaty, we would still be compelled to conclude that the defendants can not assail the legality of the seizure of their vessel in Haitian waters. Since 1815 it has been established that redress for improper seizure in foreign waters is not due to the owner or crew of the vessel involved, but to the foreign government whose territoriality has been infringed by the action. In *The Richmond,* 1815, 13 U.S. (9 Cranch) 102, 3 L.Ed. 670, the Court rejected a challenge similar to the one we face here to the seizure of an American registered vessel in the territorial waters of Spain. Chief Justice Marshall explained, "The seizure of an American vessel, within the territorial jurisdiction of a foreign power, is certainly an offense against that power, which must be adjusted between the two governments. This court can take no cognisance of it." 13 U.S. at 103, 3 L.Ed. at 671. Here, where not even the foreign government complains of the American assertion of sovereignty over its own vessel, defendants have no basis for complaint unless the seizure was improper on some other grounds.

without such a reservation. Treaties in Force, January 1, 1978, p. 327.

**15.** *See, e. g., Almeida-Sanchez v. United States,* 1973, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596. The U. S. Attorney may wish to draw to the attention of the Congress that, apparently, it has never given authority to any magistrate to issue warrants outside the confines of a judicial district. Rule 41(a), F.R.Cr.P. autho-

## C. Absence of a Warrant

 We have dealt with other issues before reaching the constitutional question. Having concluded that the search was not invalidated by lack of authority to make it, we must consider whether the Coast Guard was required by the Fourth Amendment to obtain a warrant before proceeding. It is almost too obvious to require reiteration that the mere existence of statutory authority to make a search does not obviate the need for Fourth Amendment compliance.[15] This constitutional issue was involved both in *Warren, supra,* and in *Cadena, supra.* In each of these cases there was a warrantless search by the Coast Guard. The *Warren* majority, whom we have already quoted, recognized in Section 89(a) a grant of plenary authority to stop and board United States vessels on the high seas for either a safety-and-document inspection or to check for obvious customs and narcotics violations. Once aboard, if probable cause arises to suspect the presence of narcotics, a search can then be made of the vessel. Judge Fay dissented from the suggestion he found in the opinion that the statute gives plenary authority to search; nevertheless he began:

No one can question that the Coast Guard may stop and search an American vessel on the high seas when it has probable cause to believe a crime has been or is being committed. [578 F.2d at 1079.]

Neither opinion speaks directly to the question whether probable cause alone justifies the warrantless search of an entire vessel as compared to boarding for purposes of a safety-and-document inspection and a check for obvious customs and narcotics violations.

rizes issuance of a warrant by a judicial officer "within the district wherein the property sought is located." *Cf. Berlin Democratic Club v. Rumsfeld,* D.D.C.1976, 410 F.Supp. 144, 160. ("The court's authority over federal officials is sufficient to require an official to present for approval in the United States a warrant for a wiretap overseas").

In *Cadena* a foreign vessel was intercepted on the high seas pursuant to Section 89(a) authority. The vessel's subsequent flight created probable cause to search without regard to any prior knowledge of the Coast Guard of the vessel's activities.

We find *Cadena* persuasive precedent. Here, as in *Warren* and *Cadena*, the Coast Guard had plenary authority to stop and board the ship. The DAUNTLESS was indeed lying in wait for the NAHOA. There was previously existing probable cause to believe the vessel was engaged in smuggling; we may assume, arguendo, that a warrant would have been necessary had the NAHOA docilely continued on its course, approached the DAUNTLESS and, upon being hailed, submitted to a search.[16] However, the NAHOA's flight of itself created exigent circumstances that, coupled with the antecedent probable cause, justified the subsequent warrantless search of the vessel.[17]

## IV. SUFFICIENCY OF THE EVIDENCE AS TO WALKER

All of the defendants were charged in an indictment alleging that they "did wilfully . . . conspire . . . to commit offenses against the United States. . . . It was part of said conspiracy that the defendants would knowingly and intentionally import into the United States from a place outside thereof, a controlled substance . . . ." Although defendant Walker concedes that he loaded marijuana aboard the NAHOA, he contends, first, that there was insufficient evidence to establish that there was a conspiracy to import marijuana *into the United States*; moreover, even if the other defendants joined in such a scheme, there was no evidence whatsoever to establish that he had knowledge that the plot was directed at the United States. He maintains that he believed the NAHOA was bound for a rendezvous with a Canadian trawler off George's Bank when it was ap-

prehended by United States Coast Guard authorities.

Walker was convicted of conspiracy to violate 21 U.S.C. § 952(a) which makes it illegal "to import into the United States from any place outside thereof, any controlled substance . . . ." Our duty here is to determine whether a reasonable jury could, after hearing all the evidence, conclude that the defendant was guilty of the specific crime charged beyond a reasonable doubt. *United States v. Restrepo-Granda*, 5 Cir. 1978, 575 F.2d 524, 527; *United States v. Alonzo*, 5 Cir. 1978, 571 F.2d 1384, 1387; *United States v. Warner*, 5 Cir. 1971, 441 F.2d 821, 825, cert. denied, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58. It would not suffice to show that beyond peradventure he was engaged in some other criminal act.

To achieve a conviction on the conspiracy count, the government had the burden of proving an agreement among the defendants including Walker, the intended purpose of which was a violation of United States law. The essence of conspiracy is agreement; "[n]obody is liable in conspiracy except for the fair import of the concerted purpose or agreement as he understands it." *United States v. Peoni*, 2 Cir. 1938, 100 F.2d 401, 403 (L. Hand, J.). *See also United States v. Borelli*, 2 Cir. 1964, 336 F.2d 376, 384, cert. denied, 1965, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555; *United States v. Andolschek*, 2 Cir. 1944, 142 F.2d 503, 507. It is not necessary that the members of the conspiracy know all the details of the plan, but they must be aware of the essential nature and scope of the enterprise and intend to participate. *United States v. Rosenblatt*, 2 Cir. 1977, 554 F.2d 36, 38; *Stanley v. United States*, 6 Cir. 1957, 245 F.2d 427, 430; *Duke v. United States*, 5 Cir. 1956, 233 F.2d 897, 901. Such knowledge must be clear and unequivocal, but can be inferred from the circumstances and conduct of the parties involved. *United States v. Addoni-*

16. *See United States v. Cadena*, 5 Cir. 1979, 588 F.2d 100 (denial of petition for rehearing).

17. For a discussion of statutory and constitutional authority for searches of vessels, written

prior to *Warren* and *Cadena*, see Carmichael, *At Sea With the Fourth Amendment*, 32 U.Miami L.Rev. 51 (1977).

*zio,* 3 Cir. 1971, 449 F.2d 100, 102, *cert. denied,* 1972, 404 U.S. 1058, 92 S.Ct. 737, 30 L.Ed.2d 746; *United States v. Gallishaw,* 2 Cir. 1970, 428 F.2d 760, 763; *United States v. Fellabaum,* 7 Cir. 1969, 408 F.2d 220, 224, *cert. denied,* 396 U.S. 818, 858, 90 S.Ct. 55, 125, 24 L.Ed.2d 69, 109.

 Conspiracy to import a controlled substance into the United States requires proof of an agreement to commit every element of that substantive offense. Just as a defendant cannot be convicted of such a conspiracy without knowledge that the substance he was carrying was controlled, *see, e. g., United States v. Restrepo-Granda, supra,* 575 F.2d at 529, or without knowledge that he was transporting some substance, *see, e. g., United States v. Jones,* 9 Cir. 1975, 518 F.2d 64, 67; *United States v. Jiminez,* 5 Cir. 1973, 484 F.2d 91, 92, so the government must meet the burden of showing that the conspiracy to import was directed at the United States. *Cf. Ingram v. United States,* 1959, 360 U.S. 672, 677–78, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 ("It is fundamental that a conviction for conspiracy . . . cannot be sustained unless there is 'proof of an agreement to commit an offense against the United States.' *Pereira v. United States,* [1954,] 347 U.S. 1, 12, 74 S.Ct. 358, 364, 98 L.Ed. 435."); *United States v. Bright,* 5 Cir. 1977, 550 F.2d 240, 241 ("The essential elements of a criminal conspiracy are an agreement among the conspirators to commit an offense against the United States attended by an overt act of one of them in furtherance of the agreement"). *See also United States v. Barrera,* 5 Cir. 1977, 547 F.2d 1250, 1256; *United States v. Isaacs,* 5 Cir. 1975, 516 F.2d 409, 410, *cert. denied,* 423 U.S. 936, 96 S.Ct. 295, 46 L.Ed.2d 269.

The requirement that Walker know the destination of the cargo to be convicted of conspiracy to import marijuana into the United States in no way contradicts the holding of the Supreme Court in *United States v. Feola,* 1975, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541. *Feola* concerned merely the interpretation of a conspiracy statute in order to divine and effectuate congressional intent. The Court concluded that a person who joins in a conspiracy to assault someone can be convicted of conspiracy to assault a federal officer even though the conspirator had no knowledge that the victim was a federal agent. "[I]n order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, [18 U.S.C.] § 111 cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer. All the statute requires is an intent to assault, not an intent to assault a federal officer." *Id.,* 420 U.S. at 684, 95 S.Ct. at 1264, 43 L.Ed.2d at 552. This interpretation was followed by us in *United States v. Bell,* 5 Cir. 1978, 577 F.2d 1313, in determining the statutory elements of a conspiracy to violate the Dyer Act, 18 U.S.C. §§ 2312–2313, prohibiting interstate transportation of stolen motor vehicles.

 In *Feola,* the Court further noted that the defendant's state of mind may, however, be a relevant consideration; "[t]he statute does require a criminal intent," 420 U.S. at 686, 95 S.Ct. at 1264, 43 L.Ed.2d at 553. Here, if it be assumed that Walker indeed planned only to cooperate in the export of marijuana to *Canada,* there would be no criminal intent on his part cognizable in an American court and no federal interest involved. The importation of marijuana into Canada may or may not violate Canadian law. Even if it does, the question might be raised whether the Congress has the power, as a matter of due process, to make criminal a conspiracy entered into abroad directed only against another foreign country. We need not reach that question here for Congress has shown no intention even by remote implication to punish a person who in some other nation conspires against the laws of a third nation. Therefore, Walker's conviction on the conspiracy count necessarily must be supported by proof that he knew the marijuana was destined for the United States.

The government demonstrated the existence of an agreement involving marijuana smuggling, and showed continual activities related thereto, terminating only upon the capture of the NAHOA. There was testimony by the government informant, later contradicted by defendant Schubert on the witness stand, that the ship was bound for Connecticut or elsewhere on the eastern coast of the United States. The ship's name was written in English, and its master and all of the crew save Budal were Americans. There was also uncontroverted testimony by the government informant, Budal, that Schubert made phone calls to Walker in Jamaica during the course of the conspiracy, and that Walker joined the other defendants on board the NAHOA after the marijuana had been loaded. Had there been no testimony on behalf of the defense, Walker would not have been entitled to a directed verdict. The circumstantial evidence was sufficient to warrant his conviction.

The defense did offer Schubert's testimony regarding Walker's knowledge of the ship's destination. Schubert, it will be recalled, was one of the original planners. He testified unequivocally that the NAHOA was bound for George's Bank, and that Walker was the only one aboard the vessel to whom Schubert divulged the plan. Walker was apprised of the destination because "he had a financial interest in it." The defense sought to corroborate this by showing that the vessel did have a detailed chart of northern waters but none of the waters of the southern United States where the NAHOA was apprehended.

Clearly Walker joined in a plan to ship marijuana and he admittedly participated actively in efforts to consummate it. The jury might have believed Schubert's account, or it might have found it adequate to create reasonable doubt that Walker knew the destination of the cargo. Yet, it might also have refused to believe Schubert when he identified the destination of the cargo as Canada and sought to exonerate Walker. Under the circumstances we cannot find that there was insufficient evidence to warrant the conclusion beyond a

reasonable doubt that Walker had the requisite knowledge and intent to be guilty of conspiracy to import marijuana into the United States.

## V. WALKER'S OTHER CLAIMS

### A. Voir Dire

█ It is no abuse of discretion for the trial judge to choose to conduct the voir dire himself. *United States v. Wertis*, 5 Cir. 1974, 505 F.2d 683, *cert. denied*, 1975, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697; *United States v. Fruge*, 5 Cir. 1974, 492 F.2d 1163, *cert. denied*, 419 U.S. 856, 95 S.Ct. 101, 42 L.Ed.2d 88; *Hawkins v. United States*, 5 Cir. 1970, 434 F.2d 738; *see* F.R. Cr.P. 24(a).

█ Although defendants assert error in the district court's failure to ask specifically requested questions on voir dire, Judges Roney and Vance have concluded that the voir dire examination conducted by the trial judge was adequate and fair. The trial court asked questions during voir dire designed to disclose any prejudice on the part of the venire panel. There was no abuse of discretion in its refusal to ask the questions in the precise form requested by defendant. *United States v. Ochoa*, 5 Cir. 1976, 543 F.2d 564.

The questions requested by Walker's counsel in full were:

Mr. Walker is charged with conspiring and attempting to import marijuana into the United States. Mr. Walker admits that he was on board the vessel "NAHOA" which contained a large quantity of marijuana. Mr. Walker further admits that he procured the marijuana that was on board the vessel "NAHOA". Two of the essential elements of these offenses are that the marijuana found on the vessel "NAHOA" was destined for the United States and that the defendant Walker knew that the marijuana was destined for the United States.

(a) If the Government fails to prove beyond a reasonable doubt that the marijuana found on the vessel "NA-

HOA" was destined for the United States, would you hesitate to return a verdict of Not Guilty?

(b) If the Government fails to prove beyond a reasonable doubt that the defendant Walker knew that the marijuana found on the vessel "NAHOA" was destined for the United States, would you hesitate to return a verdict of Not Guilty?

(c) Would the fact that Mr. Walker was involved in procuring the marijuana prejudice you in any manner against Mr. Walker?

██ It was proper for the trial judge not to put parts (a) and (b) of the request to potential jurors. These sections merely ask whether the jury will, as required, fulfill its duty to decide the case according to the law and the evidence. They are not designed to elicit any particular source of potential prejudice and were adequately covered in the court's instructions. Counsel does not complain of their omission.

██ The third requested question, the denial of which is claimed as error, was:

> Would the fact that Mr. Walker was involved in procuring the marijuana prejudice you in any manner against Mr. Walker?

Judges Roney and Vance conclude that it was not improper to refuse to ask this question. They reason that whether or not Mr. Walker procured the marijuana was certainly relevant to the precise crimes here charged and such evidence could be expected to be prejudicial to a contrary contention. Counsel may have intended to ask if the marijuana procurement would so influence a juror that an objective consideration could not be made of the critical question whether Walker knew the destination of the marijuana. As the question was phrased, however, a "yes" answer would not have revealed this information; a "no" answer could neither be expected nor be con-

sistent with the juror's promise to decide the case on the evidence and instructions. A majority of this Court thus deciding there was no abuse of discretion in the failure to ask the requested questions on voir dire, the trial court's decision is affirmed.

Judge Rubin dissents from this conclusion and will assign his reasons separately.

**B. The Jencks Act Material**

Under the Jencks Act, 18 U.S.C. § 3500, the government must produce any statement in its possession relating to the subject matter of the testimony of a witness who has taken the stand for the government. Upon motion, Walker's counsel received the statements relating to testimony by the informant Budal. However, parts of the materials were incomplete. The government had cut off parts of the pages and excised paragraphs of others. In addition, the date of each statement or report had been deleted.

██ When defense counsel moved for in camera examination of the complete materials,[18] the government agreed to allow the court to read the file in its entirety; however, the court declined to look at the thick set of materials, noting "I have got better things to do than referee discovery." The government informed the court that all excised portions of the materials were, in its opinion, not discoverable under the Jencks Act, and the motion for in camera examination was then denied.

The Jencks Act requires that decisions about the discoverability of documents under its provisions be made by the trial court. 18 U.S.C. § 3500(c) provides, in part,

> If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such

---

**18.** Although the objection to the government excisions was pursued by the defense only after Budal had left the stand, it was raised immediately following direct examination by the government and was therefore not, as the government suggests, untimely. Moreover, Budal was still available and could have been recalled by the defense for further cross-examination in light of the revealed Jencks Act materials.

statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use.

As the Supreme Court held in *Palermo v. United States*, 1959, 360 U.S. 343, 354, 79 S.Ct. 1217, 1225, 3 L.Ed.2d 1287, 1296:

> [W]hen it is doubtful whether the production of a particular statement is compelled by the statute, we approve the practice of having the Government submit the statement to the trial judge for an *in camera* determination. Indeed, any other procedure would be destructive of the statutory purpose.

■■■ The task of determining whether statements relate to prosecution testimony is thus vested in the trial court, not in the government. *Scales v. United States*, 1961, 367 U.S. 203, 258, 81 S.Ct. 1469, 1501, 6 L.Ed.2d 782, 817. The duty may be onerous and unpleasant, but so, indeed, are many of the duties that judges assume. The Act does not, of course, mandate that the trial judge examine voluminous material without assistance from government counsel. The court need only review those sections that the government seeks to withhold; but it should accomplish this by studying the portions proposed to be expunged in their proper context as parts of the complete document. If the court then determines that the government's expurgation is proper, the defense has no further cause for complaint. *See, e. g., Holmes v. United States*, 4 Cir. 1960, 284 F.2d 716, 720. But where the court fails even to look at the complete materials, thereby abdicating its responsibility to government counsel, the reviewing court has no choice but to vacate the judgment and remand for an appropriate examination. *United States v. Cleveland*, 7 Cir. 1973, 477 F.2d 310; *United States v. O'Brien*, 7 Cir. 1971, 444 F.2d 1082, 1086–87; *Bary v. United States*, 10 Cir. 1961, 292 F.2d 53, 58.

■■ If the trial judge determines that no part of the expunged materials need be produced, he should enter a new judgment. Walker may then have the record sealed and transmitted to this court for review of the trial court's determination. If, on the other hand, the trial judge concludes that production of some or all of the reports was unjustly denied, it would then become his duty to accord the defendant a new trial unless he concludes that the failure was harmless under the test set forth in *Goldberg v. United States*, 1967, 425 U.S. 94, 96 S.Ct. 1338, 47 L.Ed.2d 603. *See also* discussion in *United States v. Beasley*, 5 Cir. 1978, 576 F.2d 626.

**C. Refusal to Give Requested Jury Instruction**

■■■ The defendant in a criminal prosecution is entitled to have the court instruct the jury on the defense "theory of the case", assuming that the theory has foundation in the evidence and legal support. *United States v. Cullen*, 7 Cir. 1971, 454 F.2d 386, 390; *United States v. Vole*, 7 Cir. 1971, 435 F.2d 774; *Strauss v. United States*, 5 Cir. 1967, 376 F.2d 416. The defense here proffered the following instruction:

> It is the position of the defense that the marijuana found on the vessel "NAHOA" was *not* destined for the United States to the defendant Walker's knowledge but was rather destined for Canada.

> Unless you find that the Government has proven beyond and to the exclusion of a reasonable doubt that the marijuana was destined for the United States and that the defendant Walker knew that the marijuana was destined for the United States you must return a verdict of Not Guilty for Mr. Walker.

The trial court declined to give the second paragraph of this tendered instruction, but did instruct the jury that "[t]o establish specific intent [needed to convict the defendant of conspiracy or attempt] the Government must prove that the Defendant knowingly did an act which the law forbids, purposely intending to violate the law.

Proof of specific intent requires proof that the Defendant knew the marijuana was destined for the United States." This instruction conveyed the substance of the defense theory, even if not in the exact language requested. No more was indispensable. If a new trial is not required because of the expurgations from Jencks Act materials, then a new trial on this issue is not warranted. If, however, a new trial is ordered, a more complete exposition would be appropriate.

For these reasons, the convictions of Conroy, Schubert, Dahl, and Jacobs are AFFIRMED. The judgment of conviction of Walker is VACATED and his case remanded for further proceedings as directed above.

ALVIN B. RUBIN, Circuit Judge, dissenting as to defendant Walker only:

I regret that I must differ with my brethren concerning whether the trial judge abused the very wide discretion he is allowed in conducting voir dire. I recognize that some of my colleagues think voir dire is an appropriate adversary function, e. g., United States v. Ledee, 5 Cir. 1977, 549 F.2d 990, 993, cert. denied, 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188, and that my brethren on this panel are disposed to leave the question entirely to the discretion of the trial judge. Because, however, of my firm belief in court-conducted voir dire, my dissent on this issue may appear anomalous. For this reason, I expand my views.

As a trial judge, I personally conducted voir dire in every case tried before me for eleven years, and I continue to believe that when the trial judge is diligent in the scope of his inquiry and responsive to counsel's suggestions, this method of examining potential jurors has many advantages over counsel-conducted questioning. In most cases, advocates seek by voir dire not to obtain impartial jurors but to enlist persons already predisposed in their favor. The trial judge is objective; his desire to achieve justice will be communicated to the jurors by his manner of conducting voir dire and by the phrasing of his questions. There-

fore, his election to conduct a careful voir dire will usually better assure that the jury impanelled is fair and impartial and will, in addition, save time and invest the process with the appearance of integrity that it warrants.

If he assumes the task of conducting voir dire, the trial judge also takes on the responsibility of acting on behalf of both parties in determining whether any member of the venire harbors possible prejudice however covert. The court must not only allow counsel to suggest questions that might identify potential prejudice, but must also put at least the substance of those inquiries to prospective jurors. See Silverthorne v. United States, 9 Cir. 1968, 400 F.2d 627, 638; United States v. Lewin, 7 Cir. 1972, 467 F.2d 1132.

My brethren have fully stated the entire series of voir dire questions requested by Walker's counsel. I agree with them that the trial judge did not err in failing to put parts (a) and (b). However, part (c) cannot be considered in isolation. Propounded alone and answered simply "yes" or "no," the question might not seem particularly enlightening. But as the full text of defense counsel's request shows, Walker admitted having procured the marijuana and being on board the "NAHOA"; his sole defenses were that the destination of the cargo was not the United States, but, if it was, he didn't know it. Under these circumstances, it was critical for defense counsel to know whether Walker's admitted complicity in a plot to ship marijuana (which he claimed was directed at Canada rather than the United States) would prejudice any potential juror against him. The substance of the proposed question was calculated to elicit from potential jurors a clue as to whether they harbored any predisposition to convict Walker merely because he was engaged in international marijuana dealing rather than because he was guilty of the precise crimes charged. If any juror answered "Yes", he would assuredly have been challenged for cause. An equivocal answer or even the manner in which a negative answer was delivered might have

induced counsel to exercise a peremptory challenge. No experienced trial lawyer would have wished to try Walker's case without this information.

In connection with requests for jury charges, we have repeatedly ruled that the trial judge may not refuse to charge a jury because the request is phrased inartfully. *Dahlgren v. United States,* 5 Cir. 1977, 553 F.2d 434, 440; *Ullman v. Overnite Transportation Co.,* 5 Cir. 1975, 508 F.2d 676, 677 n.2; *Messer v. L.B. Foster Co.,* 5 Cir. 1958, 254 F.2d 412, 414. *See also Wilson v. Crouse-Hinds Co.,* 8 Cir. 1977, 556 F.2d 870, 874 n.8, *cert. denied,* 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455; *Posttape Associates v. Eastman Kodak Co.,* 3 Cir. 1976, 537 F.2d 751, 757; *Chavez v. Sears, Roebuck and Co.,* 10 Cir. 1975, 525 F.2d 827, 830; *Honeycutt v. Aetna Insurance Co.,* 7 Cir. 1975, 510 F.2d 340, 349 n.11, *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679; *Weekes v. Michigan Chrome & Chemical Co.,* 6 Cir. 1965, 352 F.2d 603, 611; *Montgomery v. Virginia Stage Lines, Inc.,* 1951, 89 U.S.App.D.C. 213, 191 F.2d 770, 772. *See generally* 9 C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2552 at 631 & n.25 (1971). If the substance of the request is clear, it is his obligation to give a correct charge.

A similar principle has been recognized in connection with voir dire. The trial court has, of course, very broad discretion in conducting voir dire, *e. g., United States v. Rojas,* 5 Cir. 1976, 537 F.2d 216, 219, *cert. denied,* 1977, 429 U.S. 1061, 97 S.Ct. 785, 50 L.Ed.2d 777; *United States v. Wertis,* 5 Cir. 1974, 505 F.2d 683, 684, *cert. denied,* 1975, 422 U.S. 1045, 95 S.Ct. 2662, 45 L.Ed.2d 697; *United States v. Gassaway,* 5 Cir. 1972, 456 F.2d 624, 626, but "subject to the essential demands of fairness." *Aldridge v. United States,* 1931, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054, 1056. The procedure used for testing prospective juror impartiality must create "a reasonable assurance that prejudice would be discovered if present." *United States v. Dellinger,* 7 Cir. 1972, 472 F.2d 340, 367, *cert. denied,* 1973, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706. Thus, refusal to inquire into a particular subject which affects the basic fairness of the trial is not acceptable. *United States v. Eastwood,* 5 Cir. 1973, 489 F.2d 818, 820.

The trial judge need not ask every question requested by counsel, or put the inquiry in any particular form. *Ham v. South Carolina,* 1973, 409 U.S. 524, 527, 93 S.Ct. 848, 850–51, 35 L.Ed.2d 46, 50. "It is enough if the court covers the substance of the necessary areas of its own questions." *United States v. Nell,* 5 Cir. 1976, 526 F.2d 1223, 1230 n.9. Broad, general inquiries into potential bias do not satisfy the court's duty in this regard. Once counsel had made the judge aware of the need to ascertain whether prospective jurors might be biased against Walker on the basis of his admitted involvement in marijuana smuggling, the judge had the obligation to put the substance of that question fairly.

After deliberating, the jury convicted Walker of conspiracy, but acquitted him of attempt. Because the only issue Walker contested at trial was his knowledge of the destination of the shipment, the verdicts appear to be inconsistent; the verdict of guilty on a single count may have been the result of a "bargain" to resolve a deadlock.

I would conclude that Walker was prejudiced by the failure to inquire into possible prejudgment of his guilt based merely on moral turpitude, and would grant him a new trial.