**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 91-2091

_____

United States of America,

Plaintiff-Appellee,

VERSUS

Folonsho Samuel Ojebode,

Defendant-Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas

(March 30, 1992)

Before REAVLEY, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

DEMOSS, Circuit Judge:

I.

Folonsho Samuel Ojebode, a Nigerian citizen legally residing in the United States, was indicted for:

Count One: Conspiracy to import in excess of 100 grams of heroin from Nigeria into the United States in violation of 21 U.S.C. § 952(a), 960(b)(2)(A), and 963;

Count Two: Importation in excess of 100 grams of heroin, in violation of 21 U.S.C. § 952(a) and 960(b)(2)(A);

Count Three: Conspiracy to possess with intent to distribute in excess of 100 grams of heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846;

Count Four:     Possession with intent to distribute in excess of 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B); and

Count Five:     Possession of in excess of 100 grams of heroin aboard an aircraft entering the United States, in violation of 21 U.S.C. § 955 and 960(b)(2)(A).

The case was tried to a jury. Ojebode called no witnesses. He moved for acquittal at the close of the government's case-in-chief and the motion was denied. The jury convicted him on all counts.

Ojebode was sentenced to serve concurrent sixty-three month terms in the custody of the Attorney General to be followed by five years supervised release. On appeal Ojebode raises four grounds for relief as follows:

1. The trial court abused its discretion in refusing Ojebode's request for a subpoena duces tecum.

2. The evidence was insufficient to support Ojebode's conviction for conspiracy to import, importation, conspiracy to possess, and possession with intent to distribute.

3. The trial court erred when it instructed the jury on scienter required for conviction for conspiracy to import heroin.

4. The trial court erred when it charged the jury on deliberate ignorance.

We AFFIRM in part and REVERSE and REMAND in part.

I.

On July 22, 1990, Folonsho Samuel Ojebode, a Nigerian national but resident alien of the United States, was a passenger on a Lufthansa flight from Frankfurt, West Germany to Mexico City, with a scheduled stop in Houston, Texas. When the plane landed in

2

Houston, Ojebode and the other in-transit passengers were ordered off the plane while the crew cleaned the cabin. The passengers were directed to a transit lounge where they were to wait under the supervision of airline representatives until they could reboard the plane and continue their flight to Mexico City.

The corridor from the plane to the transit lounge was a "sterile" area with limited access only to passengers arriving from foreign ports. United States Customs Inspectors Clifford Shaefer and Frederick Waters were assigned to the corridor and had stationed themselves at the threshold of the transit lounge in the international corridor. Their duties included the interdiction of contraband and the detection of Customs law violations.

When the flight arrived, the inspectors interviewed various passengers going into the transit lounge. These interviews involved stopping the passengers and inspecting their tickets and passports. Inspector Shaefer observed Mr. Ojebode, the only black person on the Lufthansa flight, walking toward the transit lounge. Shaefer noticed Ojebode because he was carrying an unusually large carry-on bag for a transit passenger. When Ojebode approached, Inspector Shaefer asked to see his passport and ticket. Ojebode showed the inspector a Nigerian passport. Ojebode stated that he had left his airline ticket on the plane. Noting that it was unusual for an intransit passenger to be without a ticket, Shaefer directed Ojebode to Inspector Waters for an interview. Inspector Shaefer continued to screen passengers leaving the Lufthansa flight. In response to questioning, Ojebode stated that he had

3

arrived from Frankfurt where he had been visiting a sick brother and that he had travelled to Frankfurt on a round-trip ticket which he had thrown away. Waters asked Ojebode if he had been anywhere else, and Ojebode told him he had not. Waters inspected Ojebode's passport and noted that he had visited Nigeria and the Ivory Coast in October-November 1989. Waters also noticed that there was no entry stamp on Ojebode's passport to indicate that he had legally travelled to West Germany. When questioned further about his trip, Ojebode stated that he had stayed in the Frankfurt Airport for two days and was denied entry into Germany because he had no visa. According to Ojebode, another brother flew to Germany from Nigeria and gave him a ticket for Mexico. Ojebode explained that he was going to Mexico to meet his wife for a vacation. Inspector Waters became suspicious by Ojebode's responses. Waters and Shaefer escorted Ojebode to a jetway where Shaefer conducted a pat-down search of Ojebode. During the search, Inspector Shaefer noticed that Ojebode's heart beat rapidly and that his stomach seemed unusually hard and protruding. The inspectors also examined Ojebode's carry-on zipper bag and discovered a computer-generated flight itinerary and a temporary entry permit for Mexico. The itinerary did not indicate any stopover in Houston, but it did show that Ojebode had travelled from Lagos, Nigeria to Frankfurt and that he was on his way from Frankfurt to Mexico City. Ojebode's identification in his wallet indicated that he was a Houston-area resident. Ojebode had given no indication to the inspectors that he lived in Houston, Texas. The Customs inspectors thought it unusual

4

for someone living in Houston to be flying directly to Mexico and bypassing his own city. The inspectors observed that Ojebode had very little clothing in his bag and he told them that he had no other luggage. Ojebode was dressed in a loose-fitting shirt and short pants.

After the search, the inspectors removed Ojebode from his flight for further investigation. They informed him that they suspected that he was an internal body carrier of illegal narcotics, and they requested that he consent to be X-rayed at a local hospital. Ojebode refused to sign the consent form for such an X-ray, although he had initially consented to being X-rayed. The inspector transported Ojebode to a local hospital where he was detained pending a monitored bowel movement. At the hospital, Ojebode acceded to the inspector's requests that he sign a consent form to be X-rayed. The X-ray revealed numerous, unusually-shaped objects inside Ojebode's intestine. Ojebode was then admitted to the hospital to permit monitored excretion of these foreign objects. Eventually, he excreted 45 pellets containing 299.6 grams of heroin.

Later, United States Customs Agent Sarah Scott and DEA Agent Floyd Stanley came to the hospital to interrogate Ojebode. Ojebode told the agents substantially the following:

> In December 1989, he had travelled to Nigeria to attend a brother's funeral and was introduced to a man named Chuck who offered him money to smuggle heroin. After he expressed interest through a third party, Chuck wrote him a letter in which Chuck instructed him to obtain a visa from the Mexican consulate, so that he could return with the heroin from Lagos to Mexico City. Chuck further

5

instructed him to meet Chuck in Lagos to discuss the details of the smuggling operation.

He purchased a plane ticket from Houston to Lagos to meet Chuck. In Lagos, Chuck told him to deliver the heroine to a man named Santos in Mexico City. Chuck's brother furnished the heroin and the airline ticket to Mexico City to him.

II.

A. DEFENDANT'S REQUEST FOR A SUBPOENA DUCES TECUM.

Ojebode first claims on appeal that the district court abused its discretion in denying his request for a subpoena duces tecum under Fed. R. Crim. P. 17 (b).

Prior to trial Ojebode moved the court, for issuance of a subpoena duces tecum at the government's expense, requesting the Regional Commissioner of the United States Customs Service, Southern District of Texas to produce certain documents. The Court denied the request without stating any grounds to support its action.

Fed. R. Crim. P. Rule 17 (b) provides:

> The Court shall order at any time that a subpoena be issued for service on a named witness upon an ex parte application of a defendant upon satisfactorily showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.

Fed. R. Crim. P. Rule 17 (c) provides that "[a] subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein."

This Court has generally given district courts wide discretion in determining whether a subpoena should issue under Fed. R. Crim. P. 17(b). United States v. Samples, 897 F.2d 193 (5th Cir. 1990).

> Rule 17(b), Fed. R. Crim. P., governs an indigent's right to have witnesses subpoenaed at government expense. Of course, the issue is not entirely procedural; it implicates both the sixth amendment right to compulsory process and the Fifth Amendment protection against unreasonable discrimination based upon the ability to pay. We have long held, however, that, within the limits imposed by the Constitution, "[t]he decision to grant or deny a Rule 17(b) motion is vested in the sound discretion of the trial court." As a threshold matter, an indigent seeking a Rule 17(b) subpoena must allege facts that, if true, demonstrate "the necessity of the requested witness' testimony." The trial court may then exercise its discretion to deny the subpoenas if the Government demonstrates that the indigent's averments are untrue, or if the requested testimony would be merely cumulative or irrelevant. United States v. Webster, 750 F.2d 307, 329-30 (5th Cir. 1984) (citations omitted). United States v. Ramirez, 765 F.2d 438, 441 (5th Cir. 1985), cert. denied sub. nom. Perpignand v. United States, 474 U.S. 1063, 106 S. Ct. 812 (1986).

Ojebode contends that he was the only black on the airplane and the only passenger who was stopped. The subpoenaed records, he claims, would produce information that the government targets Nigerians that come through the airport and stops them solely because they are Nigerian. Ojebode indicated in his request that he would use the information to demonstrate that his detention by the Customs' inspectors was motivated by his race and nationality and was therefore "non-routine". Such a detention, he argues, is illegal under the Fourth Amendment unless supported by reasonable suspicion. United States v. Montoya de Hernandez, 473 U.S. 531, 541, 105 S. Ct. 3304, 3310, 87 L. Ed. 2d 381 (1985).

7

We do not agree. Ojebode's contention that a border search is not routine if motivated by ethnicity of a person searched is groundless. He offers no evidence to support his contention. " Border searches are considered to be reasonable by the single fact that the person or item in question enters into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause". United States v. Ramsey, 431 U.S. 606, 619, 97 S. Ct. 1972, 1980, 52 L. Ed. 2d 617 (1977). And even if such stops are made largely on the basis of ethnicity, there is no constitutional violation. United States v. Martinez-Fuerte, 428 U.S. 543, 563 (1976), 96 S. Ct. 3074, 3085 49 L. Ed. 2d 1116.

B. SUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTIONS

Ojebode next challenges the sufficiency of the evidence supporting his convictions for conspiracy to import, importation, conspiracy to possess with intent to distribute and possession with intent to distribute heroin.

In reviewing a challenge to the sufficiency of the evidence, this court "must examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the jury verdict." United States v. Lechuga, 888 F.2d 1472, 1476 (5th Cir. 1989).

The evidence of a drug conspiracy must demonstrate the existence of an agreement to import or to possess with intent to distribute; knowledge of the agreement and voluntary participation in the agreement. United States v. Lewis, 902 F.2d 1176, 1180-1181

8

(5th Cir. 1990). The government must prove at least the same degree of criminal intent necessary for the underlying substantive offense. United States v. Osgood, 794 F.2d 1087, 1094 (5th Cir. 1986). In order to convict a defendant of possession of a contraband with intent to distribute under 21 U.S.C. § 841 (a) (1), the government must prove beyond a reasonable doubt the defendant's possession of the illegal substance, knowledge, and intent to distribute. United States v. Freeze, 707 F.2d 132, 135 (5th Cir. 1983). The same elements, along with proof that the defendant played a role in bringing the controlled substance from a foreign country into the United States, will prove importation. United States v. Diaz-Carreon, 915 F.2d 951 953 (5th Cir. 1990). The necessary knowledge and intent can be proved by circumstantial evidence. United States v. Mitchell, 876 F.2d 1178, 1181 (5th Cir. 1989). Additionally, "intent to distribute a controlled substance may generally be inferred solely from the possession of a large amount of the substance." United States v. Prieto-Tejas, 779 F.2d 1098, 1101 (5th Cir. 1986).

1. Importation and Conspiracy to Import

Ojebode contends that the government failed to prove that he had the specific intent to bring the heroin into the United States. (that he knowingly imported heroin specifically into the United States). Even though the Lufthansa Flight made a regularly scheduled stop in Houston, enroute to Mexico City, he claims, no evidence was presented at trial to show that he knew of this stop. The plane ticket to Mexico City, he contends, was purchased for him

in Nigeria and the stop-over did not appear on either his ticket or his itinerary. Therefore, the evidence could not support a jury's finding that he knowingly imported heroin into the United States.

In the alternative, Ojebode argues that in order to convict for conspiracy to import, the government must prove not just that he knowingly entered the United States with heroin but also that the conspiracy to import was directed at the United States and that the United States was the ultimate intended destination of the heroin. He contends that the conspiracy could not have been directed at the United States in this case because he and his co-conspirators intended for the heroin to go to Mexico.

Defendant cites United States v. Conroy, 589 F.2d 1258, 1270-71 (5th Cir. 1979) cert. denied 444 U.S. 831 (1979), the law in this circuit, to support his contention that a conspiracy to import a controlled substance into the United States requires proof that the defendant knew the controlled substance "was destined for the United States."

The only evidence in this case that Ojebode intended to import heroin into the United States is the fact that he was a passenger on a plane that had a scheduled stop in Houston, Texas. There is no evidence that he knew that the plane would land in Houston. Therefore, the only connection between Ojebode and United States territory is the fact that he had to leave the plane when it landed in Houston so that it could be cleaned by the airline crew.

The Fifth Circuit has not previously determined whether the jury can infer knowledge by a drug carrier that a drug will enter

10

the United States by the mere fact that the carrier is present on a flight scheduled to stop in the United States.

The First Circuit, however, has addressed the issue in United States v. Franchi-Forlando, 838 F.2d 585, 587 (1st Cir. 1988), a case concerning facts very similar to the facts in this case, and found that the evidence was ample to show that the defendant knew the controlled substance was destined for the United States. The defendant, an Italian citizen living in Colombia, was on a flight from Colombia to Spain when his airplane made a scheduled stop in Puerto Rico. While waiting in the "in-transit" lounge at the airport, a United States Customs Service officer boarded the aircraft and inspected the luggage. The officer found cocaine in defendant's suitcase. The defendant was convicted of importing cocaine into the United States; possessing cocaine with intent to distribute it, and unlawfully possessing cocaine on an aircraft arriving in the United States. Aside from the flight schedule of the accused's plane, there was no evidence that the defendant intended to enter the United States.

On appeal, the defendant argued that the evidence did not support the inference that he intended to import cocaine into the United States because the government failed to prove that he knew that his plane would stop in the United States. The First Circuit affirmed the conviction and held that the evidence was sufficient to show the defendant had specific intent to enter the United States with drugs. It reasoned: "[R]egardless, we believe that the jury could conclude from the facts that the trip was long, the

11

stops were few, and the stop was scheduled that appellant knew he would land in the United States." Franchi-Forlano, 838 F.2d at 587. See also, United States v. Londona-Villa, 930 F.2d 994, 1000 (2nd Cir. 1991). ("[W]hen a person carrying drugs voluntarily traveled on a plane that was scheduled to stop in the United States, we see no reason why a jury may not infer that he or she knowingly or intentionally entered the United States with drugs").

In this case the jury could have inferred knowledge by Ojebode that the drug he was carrying would enter the United States because he chose to be present on a flight that was scheduled to stop in the United States. It is reasonable that the jury could conclude from the facts of Ojebode's flight that the trip from Frankfurt to Mexico was long, the stops were few, and that a stop was scheduled in Houston, Texas, the defendant's place of residence, that he knew he would land in the United States. Franchi-Forlando, 838 F.2d 585 at 587.

Ojebode cites no authority for his argument that he must intend the United States to be the final destination of the heroin in order to commit an importation offense.

While the evidence in this case that Ojebode intended and conspired to import drugs into the United States is, at most, minimal, in view of the First Circuit's holding, this evidence appears to be adequate to support Ojebode's conviction for importation and conspiracy to import. Furthermore, we believe such a finding is consistent with Congress' interest in the detection, prosecution and punishment of such drug offenses. Albernaz v.

12

<u>United States</u>, 450 U.S. 333, 343, 101 S.Ct. 1137, 1144 67 L. Ed. 2nd 275 (1981). The United States has a valid "federal interest" in prohibiting importation of drugs into our country where a drug carrier actually enters this country with drugs. (<u>Compare</u> <u>with</u> <u>Conroy</u> <u>supra</u> where this court found there is "no federal interest" in prohibiting importation into another country by a drug carrier who is discovered with drugs outside United States' territory.) The fact that the carrier does not intend the United States to be the final destination is not important. The reasoning behind this holding is that the United States be free from drug trafficking and the crime and violence that accompany it. <u>Id</u>.

This court finds that the evidence in this case is sufficient to support defendant's conviction for Conspiracy to Import and to Import heroin.

### 2. <u>Possession and Conspiracy with Intent to Distribute</u>

Ojebode also contends that he cannot be convicted of conspiracy to possess with intent to distribute under 21 U.S.C. § 846 unless the government proves the existence of an agreement to commit such underlying offenses and that each conspirator knew of, intended to join, and participated in the conspiracy. <u>United States v. Basey</u>, 816 F.2d 980, 1002 (5th Cir. 1987). Further, he claims, to sustain a conviction under 21 U.S.C. § 841 (a) (1) for possession of heroin with intent to distribute it, the government must show knowing, possession of heroin, with intent to distribute it, <u>United States v. Palella</u>, 846 F.2d 977, 982 (5th Cir 1988), <u>cert denied</u>, 488 U.S. 863, 109 S. Ct. 162, 102 L. Ed. 2d 133. The

13

intent required by § 841(a)(1), he claims, must be an intent to distribute narcotics within the United States. Id., United States v. Pentapati, 484 F.2d 450, 451 (5th Cir. 1973). There must be, he claims, some nexus between the United States' territory and the defendant's acts or intentions in order to convict him of possession with intent to distribute. Id.

Ojebode argues that he cannot be convicted under the facts of this case, therefore, because the evidence was that he was travelling to Mexico City and had no intent to distribute the heroin he possessed in the United States. He argues that when he landed at Houston Intercontinental Airport he had no contact with the general public because he was required to remain in the "sterile" area of the lounge until the plane was ready for reboarding. Thus, it would have been impossible for him to have distributed the contraband in the United States because he was carrying it inside his body. Accordingly, the evidence does not support the intent to distribute the heroin.

This circuit has not yet resolved the issue of whether a conviction under 21 U.S.C. 841 (a) requires proof of an intent to distribute the illegal drug inside the United States. The question was left open in United States v. Sindin, 620 F.2d 87, 90 (5th Cir. 1980) and United States v. Pentapali, 484 F.2d 400. However, the First, Second, Ninth and Eleventh Circuits have each addressed the issue and have held that mere possession of the drug in the United States is sufficient to supply the territorial nexus with the United States regardless of where distribution may have been

14

intended. <u>United States v. McKenzie</u>, 818 F.2d 115 (1st Cir. 1987); <u>United States v. Muensch</u>, 694 F.2d 28, 33-34 (2nd Cir. 1982) <u>cert denied</u>, <u>sub. nom.</u> <u>Lewis v. United States</u>, 461 U.S. 908, 1038 S. Ct. 1881, 75 L. Ed. 2d 811; <u>United States v. Gomez-Tostado</u>, 597 F.2d 170 (9th Cir. 1979); <u>United States v. Montoya</u>, 782 F.2d 1554 (11th Cir. 1986).

This position, we believe, is consistent with Congress's interest in prohibiting possession of drugs in the United States with intent to distribute outside the United States. Drug transport and drug couriers may be accompanied by crime and violence, even if the drug ends up abroad. The United States also has treaty obligations to prevent drug trafficking into other countries. Allowing United States airports to become drug conduits and trading centers for distribution throughout the world is not consistent with those obligations. <u>United States v. Muensch</u>, 694 F.2d 28.

Further, there is nothing in the legislative history to indicate that Congress intended to limit the application of § 841 (a) (1) to only those persons who possess drugs with intent to distribute within the United States, nor does the plain language of the statute distinguish between an intent to distribute in this country and an intent to distribute elsewhere. Therefore, we find that the government was not required to establish that Ojebode intended to distribute the heroin in the United States but only that he intended to distribute.

15

The quantity of heroin that Ojebode possessed supported the inference that the substance was not for his personal consumption; and, since Ojebode admitted that he intended to turn the heroin over to his contact in Mexico, the evidence supported a finding that he possessed the heroin with intent to distribute.

Ojebode's position is not supported by authority. We find that the evidence was more than sufficient to support the jury's verdict.

C. <u>SCIENTER CHARGE FOR IMPORTATION OF HEROIN.</u>

Ojebode further contends that the district court erred when it improperly failed to instruct the jury on the specific intent necessary to sustain his convictions for conspiracy to import heroin and for importation of heroin.

Defendant argues that the charge failed to include an essential element of the offense, that is, that he intended or knew that the heroin he possessed was to be imported into the United States. Further, he complains, the error was compounded by the prosecutor's closing argument over defendant's objection that: "You must only import or intend to import a substance and be in the customs territory of the United States, and you're guilty."

Title 21, U.S.C. § 952 (a) and 960 (a) (1) provides in pertinent part that:

> [I]t shall be unlawful for any person knowingly or intentionally . . . to . . . import into the customs territory of the United States from any place outside thereof any controlled substance in Schedule I.

16

According to Ojebode, Ojebode and the government initially agreed to the following instruction:

> I instruct you that the government need not prove that the defendant intended or attempted to bring the contraband through Customs, <u>but only that the defendant intended to bring the contraband into any territory of the United States.</u>

The prosecutor, however, changed the instructions when he had them typed for court. The jury instruction Nos. 21 and 22 then read:

> I instruct you that the government need not prove that the defendant intended or attempted to bring the heroin through customs, but only that the defendant brought the heroin into any territory of the United States.

Ojebode objected to the instructions because it did not require the jury to find that he "intended to bring the heroin into any territory of the United States." The court overruled the objection.

Ojebode was relying upon the law in this circuit, <u>United States v. Conroy</u>, 589 F.2d 1258, when he agreed on the original charge with the prosecutor. This court held in <u>Conroy</u> that a conviction for importation of a controlled substance requires proof that the defendant knew that the drug would enter United States territory.

The Government on the other hand cited <u>United States v. Muench</u>, 694 F.2d 28 at 32 as its authority when it changed the agreed-upon instruction to the final version of the charge that the Court read to the jury.

17

The defendants in Muench complained of their conviction of possession of narcotics with intent to distribute because they were on an international flight and did not go through Customs. The court there held upon defendant's appeal:

> [A]s we accept the appellant's implicit assumption that cases decided under §952 (a) are to some degree instructive in prosecutions under §841 (a) (1), we must also take note of cases such as United States v.Catano, 553 U.S. 865, 98 S.Ct. 199 (1977), and Palermo v.United States, 112 F.2d 922, 924 (1st Cir. 1942). These cases held that the crime of importation is complete when contraband is brought into the United States territory, regardless of whether an attempt is made to bring the contraband through customs.

Muench, 694 F.2d at 32. (emphasis added)

The government claims that in view of the holding in Muench, the charge was sufficient. Conceding that there is a mens rea requirement for the act of importation. United States v. Diaz-Carreon, 915 F.2d 951, 953 (5th Cir. 1990); United States v. Lara-Velasquez, 919 F.2d 946, 950 (5th Cir. 1990), the government argues, however, that the required mens rea extends only to the act of importation and does not extend to the jurisdictional requirement that the importation take place into the United States. The court, it contends, does not have to reach the issue of whether the statute requires knowledge or intent that the area entered into was, in fact, the United States. United States v. Londono-Villa, 930 F.2d 994.

This argument has no merit. It is true that courts are given wide latitude in framing jury instructions, United States v. Kimmel, 777 F.2d 290, 293 (5th Cir. 1985) cert. denied, 476 U.S. 1104, 106 S. Ct. 1947, 90 L. Ed. 2d 357 (1986). However it is

18

reversible error if the court refuses to submit an instruction that:

> (1) is substantially correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to present a given defense.

United States v. Chambers, 922 F.2d 228, 241 (5th Cir. 1991), quoting United States v. Mollier, 853 F.2d 1169, 1174 (5th Cir 1988).

"[A] jury's verdict cannot stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof". Cabana v. Bullock, 474 U.S. 376, 384, 106 S. Ct. 689, 696 88 L. Ed. 2d 704 (1986). See United States v. Musgrave, 444 F.2d 755, 764 (5th Cir. 1971).

Conviction for importation of a controlled substance requires proof that the defendant knew that the drug would enter United States territory. Conroy supra. The holding in Muench does not negate that requirement. The court simply found there that the government need not prove that the defendant attempted to pass through the Customs with the drugs but only that he was present with contraband on United States soil.

The trial court approved a jury charge in Ojebode that failed to comply with the Fifth Circuit Pattern Instructions for the offense of importation and one that delivered an incorrect statement of the law. The court omitted to charge the jury on an essential element of the crime of importation, that of specific intent, therefore misleading the jury about the elements of an

19

importation offense. Thus, the jury was allowed to find that Ojebode did not intend or know that the heroin he possessed was to be imported into the United States.

The government also argues that the jury charge, when read as a whole and in context, sufficiently charged the jury with regard to the necessary mens rea for the offense and was a correct statement of the law.

The jury, the government contends, was instructed by the court that the statutory scheme makes it "unlawful for any person to knowingly or intentionally import into the customs territory of the United States from any place outside thereof any controlled substance in Schedule I". The term "import" was defined as "with respect to any article, any bringing in or introduction of such article into any area". Further, the court instructed the jury that, to find the defendant guilty, they had to find that the defendant brought a controlled substance into the United States and that he knew the substance he was bringing into the United States was a controlled substance.

The additional instruction with regard to the jurisdictional element, it contends, did not negate its burden but instead, when read in context, was a correct statement of the law that the importation need only take place in the United States and that there was no requirement on the government to prove that the defendant took the drugs through Customs.

This argument also fails. It is true that this court reviews claimed deficiencies in a jury charge "by looking to the entire

20

charge as well as the arguments made to the jury."  <u>United States v. Chagra</u>, 807 F.2d 398, 402 (5th Cir. 1986).

However, nowhere in the jury instructions is found the proper scienter requirement for an importation offense.  Rather, the instructions include only the words of the statute (21 U.S.C. §§ 952 (a), 960 (a)) and the definition of "willfully."

The recitation of only statutory language is not an adequate charge to the jury.  The danger is that the language of the importation  statute can be construed to allow conviction without proof of specific intent to import into the United States, an element of the offense.  Given that Ojebode's only defense was that he did not intend to enter the United States and given that the evidence was extremely close on precisely this issue, we find that the district court committed reversible error in its instructions on the importation charge on this issue.

D.  <u>DELIBERATE IGNORANCE JURY CHARGE</u>

Finally Ojebode claims that the district court improperly instructed the jury on "deliberate ignorance" as to the conspiracy to import charge and its companion count, importation.  The instruction, he contends was not supported by the evidence.

In its charge, the district court instructed the jury, over Ojebode's objection, as follows:

> You may find that a defendant had knowledge of a fact if you find that the defendant deliberately closed his eyes to what would otherwise have been obvious to him.  While knowledge on the part of the defendant cannot be established merely by demonstrating that the defendant was negligent, careless, or foolish, knowledge can be inferred if the defendant deliberately blinded himself to the existence of a fact.

21

The standard of review of a defendant's claim that a jury instruction was error is "whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them." United States v. Stacey, 896 F.2d 75, 77 (5th Cir. 1990) (quoting United States v. August, 835 F.2d 76, 77 (5th Cir. 1987). (emphasis added). The Court "may not instruct the jury on a charge that is not supported by the evidence. United States v. Ortega 859 F.2d 327, 330 (5th Cir. 1988)

In the instant case, the district court instructed the jury that it could infer guilty knowledge "if the defendant blinded himself to the existence of a fact." It based its instruction upon the government's argument that Ojebode deliberately avoided learning the details of his flight, including the fact that it was going to stop in Houston.

Finding that the facts of this case do not support the issuance of a deliberate ignorance instruction, we find that the district court erred.

Deliberate ignorance "denotes a conscious effort to avoid positive knowledge of a fact which is an element of an offense charged". United States v. Restrepo-Granda, 575 F.2d 524, 528 998 S. Ct. 331, 58 L. Ed. 2d 332 (5th Cir. 1978), cert. denied 439 U.S. 935, 99 S. Ct. 331, 58 L. Ed. 2d 332 (1978). The evidence will support a finding of deliberate ignorance only if there is "conscious action by the defendant--the defendant consciously

22

attempted to escape confirmation of conditions or events he strongly suspected to exist." Lara-Velasquez, 919 F.2d at 951.

A deliberate ignorance instruction allows the jury to convict without finding that the defendant was aware of the existence of illegal conduct. It therefore creates a risk that the jury might convict on a lesser negligence standard. The jury, for example, might find deliberate ignorance merely because it believed the defendant should have been aware of the illegal conduct. United States v. Alvarado , 838 F.2d 311, 314 (9th Cir. 1987), cert. denied, 487 U.S. 1222, 108 S. Ct. 2880, 101 L. Ed. 2d 915 (1988). Therefore the instruction should rarely be given. Id.

This court has framed a two part test which must be met before a deliberate ignorance instruction can properly be given. The evidence must show that: (1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct. United States v. Farfan-Carreon, 935 F.2d 678, 680 (5th Cir. 1991).

The government argues that both prongs of the test have been met. The evidence, it contends, supported the inference that Ojebode was subjectively aware of the high probability that the airplane he was on would stop in the United States. The government relies on Ojebode's statements to Customs Agent Scott that he did not know the last name, telephone number, or address of "Chuck", the co-conspirator, and that he was ignorant of some of the

23

circumstances of his travel, such as why his passport was not stamped in Lagos.

The Court however does not agree that this evidence supports the fact that Ojebode purposely contrived to avoid learning of his illegal conduct. The government presented evidence that Ojebode travelled on a flight scheduled to land in Houston. The government does not suggest that Ojebode tried to avoid learning of the flight's scheduled landing in Houston. No where do we find that Ojebode deliberately 'shut his eyes' to avoid knowing what would otherwise be obvious to view. Restrepo-Granda 575 F.2d 524. There is no evidence that Ojebode refused to view the posted flight schedule or absented himself from places where he would be likely to learn of his Lufthansa Flight's likely stops. There is no reason to believe that Ojebode cared one way or other about where the plane would stop. Ojebode's statements may indicate deliberate ignorance of something, but not necessarily deliberate ignorance of the fact that the flight would land in Houston. It is difficult to see what Chuck's name, address, phone number, or the Lagos passport stamp have to do with Ojebode's flight schedule.

The only fact that the government lists with any relevance to Ojebode's "deliberate ignorance" of the circumstances of his travel is the fact that someone else purchased his ticket. Perhaps there is a greater likelihood of learning of a plane stop when one goes to a ticket counter and buys the ticket oneself. However, in this case, the purchase of the plane ticket by Chuck for Ojebode was part of the package deal. We therefore find that the government

24

has failed to prove that a reasonable person in Ojebode's position would have been suspicious of the circumstances surrounding his plane's stop in Texas.  Farfan-Carreon, 935 F.2d. 681.

### III. CONCLUSION

The convictions for Counts Three, Four and Five are AFFIRMED and the sentence issued for each count is left in tact.  We REVERSE the convictions for Counts One and Two because of the defects in the court's charge relating to intent and deliberate ignorance as applied to these Counts and Remand the case as to Counts One and Two for retrial, if the government so elects.